**FREDERICK COUNTY FRUIT GROW-
ERS' ASSOCIATION, INC.**

v.

**Honorable F. Ray MARSHALL and J.
Terrell Whitsitt.**

Civ. A. No. 77–0092(H).

United States District Court,
W. D. Virginia,
Harrisonburg Division.

July 29, 1977.

William A. Johnston, Harrison & Johnston, Winchester, Va., S. Steven Karalekas, Wilkinson, Cragun & Barker, Washington, D. C., for plaintiff.

Robert B. Amidon, Asst. U. S. Atty., Roanoke, Va., Jonathan H. Waxman, U. S. Dept. of Labor, Washington, D. C., for defendants.

Howard S. Scher, Migrant Legal Action Program, Inc., Washington, D. C., for amicus curiae.

## OPINION and ORDER

DALTON, District Judge.

On July 14, 1977 the plaintiff, an association of apple growers, was granted a temporary restraining order against the Secretary of Labor and the Regional Administrator of the Employment and Training Administration, Region III, of the United States Department of Labor. A hearing was held on July 21, 1977 on plaintiff's motion for a preliminary injunction. The Migrant Legal Action Program, Inc., of Washington, D. C., was granted leave to

appear as *Amicus Curiae* and participated fully in the hearing.

Jurisdiction rests with this court under 28 U.S.C. § 1331(a) as an action against officers of the U. S. in their official capacity and arising under the laws of the U. S.

## FACTS

The Frederick County Fruit Growers' Association (FG) represents its members in all matters related to obtaining domestic labor through the services of the Interstate Clearance System (ICS) established under the Wagner-Peyser Act. FG also performs all things necessary to allow growers where necessary to obtain offshore temporary agricultural workers.

Historically, plaintiff's growers have been unable to recruit sufficient local workers to harvest their apple crops. In recent years only a small percentage of the plaintiff's growers' work force has been intrastate labor while approximately 60% of the labor has come from offshore sources.

Before offshore labor can be hired, growers normally must attempt to recruit domestic labor by utilizing the ICS. Access to this system is obtained by filing a job order. Job orders contain minimum terms of employment which the grower must offer to any employee recruited under the ICS. Certain terms in the orders are required by regulations issued by the Labor Department.

The defendants have refused to approve plaintiff's growers' job orders because the orders do not, in defendants' opinion, meet the minimum requirements with regard to worker transportation. Plaintiff's growers' orders contemplate reimbursement of workers' expenses for travel and subsistence from place of recruitment to place of employment. Defendants contend these funds must be advanced in at least some cases.

To fully understand the dispute it is necessary to consider the statutory framework in which it arises. A review of the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.* and the Interstate Clearance System as well as the obligations of the Secretary of Labor

under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* is necessary. A memorandum filed by defendants gives a good explanation of the system involved and is therefore relied on extensively in the explanation which follows.

The Interstate Clearance System

■ The Wagner-Peyser Act of 1933, as amended, 29 U.S.C. § 49 *et seq.* created a cooperative federal state Employment Service (ES) system. The objective of the Act was to develop a national system of employment offices to assist persons in obtaining employment. Its primary purpose is to connect the unemployed worker with a job. Job orders by employers are placed with the ES in the local office closest to the place of employment. Worker applications are submitted at the local office nearest the worker's location.

The local office first attempts to match the unemployed worker with a job in the local area if that is his desire. Concurrently, the employer's job order is sought to be matched with a local worker. Migrant and seasonal farm workers seeking agricultural employment are exposed to job orders in various areas and various crops depending upon their desires and experience.

If a local job and a local worker cannot be matched, the local job order is "extended" intrastate to determine if workers are available to fill the order within the state in which the local office is located.

Generally, a sufficient number of local or intrastate workers are available. However, since historically there has been a shortage of local workers to perform some types of agricultural work, the Act mandates establishment of an interstate system for the recruitment of workers who are recruited from those states with an excess of agricultural workers. The workers in these supply states are referred through this interstate clearance system to jobs in "demand" states (such as Virginia). The requirements for both intrastate and interstate job orders seeking workers are set out in 20 C.F.R. § 653.108.

Section 653.108 sets out the requirements for an acceptable interstate job order. It includes standards regarding nondiscrimination, deductions from pay, wages, housing and other working conditions including travel. The specific provision, applicable to this matter, regarding transportation costs is set out at 20 C.F.R. § 653.108(c)(5). This regulation provides:

> The employer has agreed to provide or pay for the transportation of the workers on at least *the same terms as transportation is commonly provided by employers in the area of intended employment to agricultural workers recruited from the same area of supply;*

(emphasis added).

If sufficient domestic workers are not available, an employer may seek approval to obtain temporary foreign agricultural workers.

Temporary Foreign Workers

Temporary foreign workers may be employed in the United States if U. S. workers are not available and if their employment will not adversely affect U. S. workers. The admission of the foreign worker is pursuant to the Immigration and Nationality Act (INA) (8 U.S.C. § 1101 *et seq.*) and the regulations thereunder. The INA defines as nonimmigrant a person

> having a residence in a foreign country which he has no intention of abandoning . . . who is coming temporarily to the United States to perform temporary service or labor, if unemployed persons capable of performing such service or labor cannot be found in this country. 8 U.S.C. § 1101(a)(15)(H)(ii).

The admission of nonimmigrant aliens is accomplished under conditions as prescribed by the Attorney General, 8 U.S.C. § 1184(a). Pursuant to the INA the Attorney General must consult with "appropriate agencies of the government" prior to a determination on the petition of an employer for the importation of temporary nonimmigrant alien workers, 8 U.S.C. § 1184(c).

The Attorney General, through the Immigration and Naturalization Service (INS), has promulgated regulations to implement his responsibilities regarding the importation of temporary workers. These regulations designate the Department of Labor as the appropriate governmental agency for consultation prior to the admission of temporary foreign workers. The regulations at 8 C.F.R. § 214.2(h)(3) require:

> . . . [e]ither a certification from the Secretary of Labor . . . stating that qualified persons in the United States are not available and that the employment of the beneficiary will not adversely affect the wages and working conditions of workers in the United States similarly employed, or a notice that such a certification cannot be made . . . .

This regulation goes on to provide that if the Secretary of Labor indicates that he is unable to make a certification, the petitioner (i. e. the employer) may present countervailing evidence to the INS to obtain the admission of the foreign workers.

Under the authority of the INA and the regulations of the INS, the Secretary of Labor has promulgated regulations at 20 C.F.R. §§ 602.10, 10a and 10b which set forth the requirements and procedures applicable to requests for certification by employers seeking the services of temporary foreign workers in agriculture. They provide for determining the "availability" of domestic workers and the amelioration of the "adverse affect" occasioned by the presence of temporary foreign labor in agriculture.

20 C.F.R. § 602.10(b) initially requires the employer seeking foreign workers to file local job offers for U. S. workers. Section 602.10(d)(2) requires the use of the interstate clearance system. Section 602.10a(g) specifically concerns transportation and states that offers to U. S. workers shall:

> Require the employer to provide or pay for transportation and subsistence en route from the place of recruitment to the place of employment in those cases where the worker completes at least 50 percent of the contract. The amount

paid per day for subsistence en route from the place of recruitment must be at least as much as the amount authorized to be charged each day for meals at the place of employment. An employer who has advanced payment to a worker for the costs of transportation and subsistence en route may deduct such costs from earnings of the worker until the worker has completed 50 percent of the contract period. However, upon completion of 50 percent of the contract period, the worker shall be entitled to reimbursement of the amounts so deducted. If the worker completes his contract, the employer will provide or pay the cost of return transportation and subsistence en route from the place of employment to the place of recruitment, except when the worker is not returning to the place of recruitment and has subsequent employment with an employer who will bear transportation expenses. All transportation provided by the employer will be by common carrier or other transportation facilities which conform to applicable regulations of the Interstate Commerce Commission.

Defendants interpret the above sections and 20 C.F.R. § 653.108(c)(5), *supra* pp. 2–3) as requiring the advancement of transportation costs. The parties have agreed on all terms contained in the job order except those relating to transportation but since plaintiff's growers have offered only to reimburse workers for their travel expenses, defendants have consistently refused to approve the job orders and place them in the system.

The harvest season for apples begins in approximately the first week in September. It normally requires four weeks for a job order to work its way through the ICS. Since growers cannot begin to hire foreign workers until an order has completed this system, it is important that a decision on this matter be reached promptly.

## OPINION

### I

A very narrow question is involved in this action. It is agreed by all parties that a grower must pay reasonable transportation and subsistence expenses from the worker's place of recruitment to the place of employment for any worker who completes 50% of his contract. In fact in the job orders submitted by the growers, they have agreed to reimburse these costs to any worker who completes 15 days of employment or 50% of the contract, whichever is shorter.[1] The

---

1. A representative job order submitted with plaintiff's complaint says the following with regard to transportation:

The employer agrees to reimburse any worker, or any government agency, or any private organization or any person who, on behalf of a worker, has paid for or advanced reasonable transportation expenses and reasonable subsistence expenses from the worker's place of recruitment to Winchester, Virginia, for each worker who continues under employment for a period of (15) consecutive calendar days, or 50% of the contract period, whichever is shorter. Those individuals or organizations paying the transportation and reasonable subsistence expenses from the worker's place of recruitment to Winchester, Virginia, for any worker who is unable to complete the minimum employment for legitimate medical reasons shall also be reimbursed for the same. In addition, those organizations or individuals paying such transportation and subsistence expenses for workers who are terminated by employer as a result of an act of God (an act of shall mean any frost, hail, storm, flood or other natural calamity other than drought of such character

as to make further fulfillment of this contract impossible), or as a result of a mutual agreement of worker and employer shall be reimbursed for the same. All payment aforesaid shall be due on a day not later than the first work day subsequent to the completion of the aforesaid minimum employment period. In the case of a medical termination or in the case of termination as a result of an act of God, the employer will also provide or pay the cost of return transportation and subsistence enroute from the place of employment to the place of recruitment, except when the worker is not returning to the place of recruitment and has subsequent employment with an employer who will bear transportation expenses. If the worker completes his contract, the employer will provide or pay the cost of return transportation and subsistence enroute from the place of employment to the place of recruitment, except when the worker is not returning to the place of recruitment and has subsequent employment with an employer who will bear transportation expenses. All transportation provided by the employer will be by common carrier or other transportation facilities which conform to ap-

only question before this court is whether the transportation and subsistence costs must be paid in advance by the employer or may be reimbursed to the worker when he becomes legally entitled to them at the end of 15 days or 50% of the contract period.

Two regulations deal with transportation costs—20 C.F.R. § 602.10a(g) [2] and 20 C.F.R. § 653.108(c)(5) [3]. Section 602.10a(g) contains the requirement stated above that workers who complete 50% of their contract must have their transportation provided or paid for. The regulation states in part: "Any employer who has advanced payment to a worker for the costs of transportation and subsistence en route may deduct such costs from earnings of the worker . . .". This language when considered with the rest of this regulation indicates that advance payment is possible but not required.

■ The defendants in their memorandum (p. 13) admit that the regulation contemplates arrangements where transporta-

tion may be either advanced or reimbursed and that neither method is required. This court is in agreement with the court in *Patterson Orchard, F. A. Patterson, Owner et al v. Marshall, et al*, No. 77–147 (D.Vt., June 30, 1977) when it stated that an interpretation by the Secretary of § 602.10a(g) which called for advanced transportation costs was not rationally based. Therefore, the key to this action is found in 20 C.F.R. § 653.108(c)(5) which requires that transportation be provided "on at least the same terms as . . . is commonly provided by employers in the area of intended employment to agricultural workers recruited from the area of supply".

This court must determine whether defendants have acted in an arbitrary or capricious manner or abused their discretion by requiring the job orders to include a provision for advanced payment of travel expenses.

■ The relevant "area" involved is the State of Virginia. This determination is in

plicable regulations of the Interstate Commerce Commission. Transportation from the worker's on-the-job site living quarters to the place where the work is to be performed will be provided by the employer without cost to the worker.

The crew leader will transport workers from the place of recruitment to Winchester, Virginia and return when the season is completed. Regular ICC regulations apply.

2. 20 C.F.R. § 602.10a(g) reads in full:

The offers to U. S. workers made in accordance with this section and § 602.10(b) shall:

&ast; &ast; &ast; &ast; &ast; &ast;

(g) Require the employer to provide or pay for transportation and subsistence en route from the place of recruitment to the place of employment in those cases where the worker completes at least 50 percent of the contract. The amount paid per day for subsistence en route from the place of recruitment must be at least as much as the amount authorized to be charged each day for meals at the place of employment. An employer who has advanced payment to a worker for the costs of transportation and subsistence en route may deduct such costs from earnings of the worker until the worker has completed 50 percent of the contract period. However, upon completion of 50 percent of the contract period, the worker shall be entitled to reimbursement of the amounts so deducted. If the worker completes his contract, the employer will provide or pay the cost of return transportation and subsistence en route from the place of employment to

the place of recruitment, except when the worker is not returning to the place of recruitment and has subsequent employment with an employer who will bear transportation expenses. All transportation provided by the employer will be by common carrier or other transportation facilities which conform to applicable regulations of the Interstate Commerce Commission. Transportation from the worker's on-the-job site living quarters to the place where the work is to be performed will be provided by the employer without cost to the worker. Hourly paid workers shall be paid no less than the adverse effect rate, as provided at § 602.10b(a)(1) or § 602.10b(c), for all time between arrival at the first work location of the day and departure from the last work location for that day.

3. 20 C.F.R. § 653.108(c)(5) reads:

(c) No local office shall place a job order for agricultural workers into intrastate clearance unless:

&ast; &ast; &ast; &ast; &ast; &ast;

(5) The employer has agreed to provide or pay for the transportation of the workers on at least the same terms as transportation is *commonly provided* by employers in the area of intended employment to agricultural workers recruited from the same area of supply. (emphasis added)

20 C.F.R. § 653.108(d)(1) makes this provision applicable to interstate clearance orders.

accord with the decision in the *Patterson* case which determined the relevant area to be the State of Vermont. Since the job orders are initially processed on a statewide basis this determination facilitates a determination of what is commonly provided in the area.

The majority of growers belonging to FG are "criteria" growers—growers who rely on some foreign workers to aid in harvesting the apple crop. In recent years these growers have been required by the government of the British West Indies (BWI) to advance transportation costs to the workers they recruited from that source. United States law required that domestic workers be treated on equal terms with foreign workers, therefore the criteria growers have in recent years advanced transportation costs to most workers.

FG has consistently endeavored to convince the BWI government that grower advances are not in the best interests of the growers or the workers. This year the BWI government has agreed that grower advances need not be supplied and the growers are attempting to adjust their job orders accordingly. Our government, however, maintains that advance payments have now become the commonly prevailing practice and should therefore be continued. This court would have great difficulty in agreeing that a practice which was followed only because it was legally required must now be continued because it has become "commonly prevailing".

However, determination of this issue is not necessary for a decision in this matter. Even if it is conceded that the commonly prevailing practice for "criteria" growers is that of advanced transportation, that does not settle the issue. According to testimony by Robert L. Masden, Commissioner of the Virginia Employment Commission, there were approximately 120 interstate job orders filed in Virginia this year, only 40 of which were from "criteria" growers. The terms of the 80 noncriteria orders called for crew leader supplied transportation rather than advances by employers. Masden estimated that 3,000–3,500 foreign and domestic workers are recruited by job orders yearly and that relatively few of these workers received advanced payments by employers. Masden further testified that only 100–150 of the domestic workers recruited by job orders received advances from the employer. He states in his affidavit that "Agricultural employers in Virginia do not commonly provide for advanced transportation and subsistence payments to domestic agricultural workers."

Edward A. Scheopner of the Department of Labor stated in his affidavit (p. 4) that job orders submitted by Virginia growers make provision for advancing transportation and subsistence costs where necessary and cites as representative job orders Exhibits J, K and L. Mr. Scheopner admitted in his testimony that he had no specific knowledge of the number of employer advances made in Virginia. His opinion was based on old job orders and telegrams from ES offices in "supply" states.

A close examination of Exhibits K and L show that these representative job orders do not require advanced travel expenses by the employer. They merely state that in cases where the employer chooses to advance travel costs they will be deducted from the worker's pay.

When all the evidence is considered it is clear that in the majority of cases, crew leaders provided the transportation for workers and the crew leaders were then reimbursed by the growers in some fashion. Plaintiff's growers' job orders contemplate such an arrangement. It is true that a small minority of individual workers have had transportation costs advanced to them in past years, but growers in Virginia, the relevant area, commonly provide transportation through reimbursement of crew leaders. Such a system is contemplated by the job orders submitted by plaintiff's growers.

II

A finding that plaintiff's growers' job orders comply with the terms of 20 C.F.R. § 653.108(c)(5) does not settle the matter. The Labor Department's interpretation of the regulation, "becomes of con-

trolling weight unless it is plainly erroneous or inconsistent with the regulation." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Also, if the meaning of the words used in a regulation are in doubt, a court must look to the administrative construction. *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 276, 89 S.Ct. 518, 21 L.Ed.2d 474 (1976).

The Secretary of Labor takes the position that since a few workers have received advances in the past the job orders should continue to require them. The language of the regulation is clear. Growers must provide terms equal to those "commonly provided" by other growers in the area. "Commonly" is defined by Webster's Third New International Dictionary as follows: "as a general thing: often in the usual course of events; usually, ordinarily." There is no doubt of the meaning of the words used in this regulation. Growers must offer in their job order terms as good as those generally or ordinarily provided. The evidence shows that growers in Virginia do not generally or ordinarily advance transportation costs. The Secretary's interpretation of the regulation in question is inconsistent with the plain meaning of the regulation and cannot, therefore, be upheld.

### III

The test for a preliminary injunction is threefold:

1) Are the moving parties likely to prevail on the merits?

2) Does the balance of irreparable damage favor the issuance of an injunction?

3) Does the public interest support granting the injunction?

*Conservation Council of North Carolina v. Costanzo*, 528 F.2d 250 (4th Cir. 1975).

As the preceding discussion indicates the plaintiff is likely to prevail on the merits.

Plaintiff's growers do face irreparable harm if the preliminary injunction is not granted. The apple harvest begins in September and plaintiff's growers normally harvest 3 to 4 million bushels of apples, valued at approximately 10 million dollars. Last year alone shortages of manpower led to crop losses for these growers of $300,000. The growers will be unable to obtain sufficient manpower for the harvest without the use of the ICS and unless this injunction is granted they could only obtain access to the system of offering advanced transportation costs. In 1976 plaintiff's growers lost over $25,000 in advanced travel costs to workers who ultimately were not entitled to the advances. Plaintiff's growers will suffer irreparable damage if this injunction is not granted.

The public interest supports the granting of this injunction. If the injunction is not granted growers will suffer the financial harm noted above. These costs will not be borne solely by the growers. To the extent possible they will be passed on to the consumer in the form of higher prices. This will be particularly true if crop losses due to insufficient manpower cause a decrease in the supply of apples.

Defendants argue that some workers will not be able to accept employment with growers unless they receive an advance of travel costs. Accepting this as true, it must be remembered that this decision does not foreclose advancement of travel costs; it merely says that growers are not required to offer advances as a minimum term of employment. Advances will still be available from crew leaders in many instances and at least one grower testified that he would still advance travel expenses to a worker he knew to be trustworthy, if the advancement was necessary.

The three part test for a preliminary injunction has been met by plaintiff. Accordingly, defendants are hereby enjoined from rejecting plaintiff's growers' job orders on the ground that they do not provide for the advancement of funds for transportation from the place of recruitment to the place of employment.