**Jose FLORES, et al., Plaintiffs–Appellants,**

**v.**

**Reyes RIOS and Gibsonburg Canning Company, Defendants–Appellees.**

No. 93–3670.

United States Court of Appeals, Sixth Circuit.

Argued May 9, 1994.

Decided Sept. 26, 1994.

Randall C. Marshall (argued and briefed), Mark Heller, Office of Advocates for Basic Legal Equality, Inc., Toledo, OH, for plaintiffs-appellants.

Jodie Lee Stearns (argued and briefed), Mitchell, Stearns & Hammer, Bowling Green, OH, for defendants-appellees.

John J. Rademacher, American Farm Bureau Federation, Park Ridge, IL (briefed), for American Farm Bureau Federation, amicus curiae.

Michael S. Bogren (briefed), Plunkett & Cooney, Kalamazoo, MI, for George Miller, amicus curiae.

Paula W. Coleman, U.S. Dept. of Labor, Office of the Sol., Washington, DC (briefed), for United States Dept. of Labor, amicus curiae.

Before: ENGEL, RYAN, and NORRIS, Circuit Judges.

ENGEL, J., delivered the opinion of the court, in which ALAN E. NORRIS, J., joined. RYAN, J. (pp. 516–17), delivered a separate opinion concurring in the judgment.

ENGEL, Circuit Judge.

This case involves the proper interpretation of 29 U.S.C. § 1803(a)(1), which exempts family farms from regulations generally applied to agricultural employers under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801 *et seq.* Defendant Gibsonburg Canning Co. ("GCC") is a tomato farm and cannery operated by John and Jerry Schuett. Defendant Reyes Rios is a farm worker employed by GCC. In 1989, plaintiff Jose Flores asked Rios to call the Schuetts and ask if farm work was available for the Flores family. Through Rios, Jerry Schuett instructed Flores to relocate his family from Santa Rosa, Texas to Gibsonburg, Ohio to harvest tomatoes for GCC. Flores brings this action individually and on behalf of his wife and children, claiming that GCC violated AWPA by failing to compensate them properly, failing to provide adequate housing, and failing to make certain required disclosures. GCC concedes non-compliance, but insists that as a family farm, it is exempt from AWPA regulation.

Immediately prior to their scheduled trial date, Flores and GCC agreed to 28 stipulations of fact. *Flores v. Gibsonburg Canning Co.*, No. 3:89CV7560 (N.D. Ohio Sept. 25, 1992), Joint Stipulations of Fact (hereinafter "Joint Stipulations"). In response to the parties' joint motion for the entry of judgment based upon their stipulated facts, the district court concluded that GCC qualified for AWPA's family business exemption, and consequently dismissed the suit. For the following reasons, we REVERSE the judgment of the district court.

## I. Background

AWPA protects migrant workers by establishing safety, compensation, and disclosure requirements with which all agricultural employers and labor contractors must comply. *See Bueno v. Mattner,* 829 F.2d 1380, 1382 (6th Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988). AWPA also protects farmers by establishing a clear standard of acceptable conduct which minimizes the risk of "haphazard" and "burdensome" litigation. H.R.REP. No. 885, 97th Cong., 2d Sess. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4547, 4547. As the legislative history explains, AWPA "[wa]s a consensus bill" enacted "only after extensive negotiation between representatives of the agricultural community, organized labor, migrant groups, the United States Department of Labor, and

the committees of jurisdiction in both [houses of Congress]." *Id.*

■ Apparently believing that family farms pose little threat of worker exploitation, Congress has exempted such operations, under certain conditions, from AWPA's regulatory scope. 29 U.S.C. § 1803(a)(1).[1] AWPA's legislative history suggests that the family business exemption should "be construed narrowly in a manner that furthers the remedial purposes of this Act." H.R.Rep. No. 885, at 12, U.S.Code Cong. & Admin.News 1982 at 4558. *See Caro–Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1505 (11th Cir.1993) ("AWPA is a remedial statute and should be construed broadly to effect its humanitarian purpose."); *Martinez v. Shinn*, 1991 WL 84473, at *16 (E.D.Wash.1991), *aff'd*, 992 F.2d 997 (9th Cir.1993). Courts applying the family business exemption must take great care to avoid exposing workers to any serious threat of abuse.

■ At the same time, any proper interpretation of section 1803(a)(1) must not frustrate Congress' deliberate exemption of family farms from AWPA regulation. As the legislative history notes, AWPA was a consensus bill, designed at least in part to protect farmers from haphazard and burdensome litigation which does not further the act's remedial purposes. This is not, of course, the first time that Congress has embraced a federal policy designed to benefit the oft-beleaguered family farmer. *See* 11 U.S.C. §§ 1201–1231 (providing special bankruptcy protection to family farmers). Because Congress has deliberately chosen to exclude these farmers from AWPA's regulatory scope, we must avoid any interpretation which "obliterate[s]" or "eviscerates" the exemption. *Calderon v. Witvoet*, 999 F.2d 1101, 1103 (7th Cir.1993).

■ The text of 1803(a)(1), *supra* note 1, indicates that the family business exemption applies to family-owned farms as long as all "farm labor contracting activity on behalf of [the] farm" is performed "exclusively" by

family members. Thus, a court evaluating a farmer's claim to the family business exemption must conduct a two-step analysis. First, the court must identify the labor contracting activities involved in the farm's operation. Second, the court must ascertain whether these farm labor contracting activities were performed exclusively by members of the farmer's family. The performance of any farm labor contracting activity by a non-family member "spoils" an agricultural employer's claim to the family business exemption. *Bueno*, 829 F.2d at 1382–83; *Calderon*, 999 F.2d at 1103–05; *Martinez*, 1991 WL 84473, at *16.

To identify GCC's "farm labor contracting activities," and ultimately to determine whether all of these activities were performed exclusively by John and Jerry Schuett, we must first divine from the statute which practices Congress wished to treat as farm labor contracting activities. In 29 U.S.C § 1802(6), we find six relatively distinct contractual endeavors listed as examples of farm labor contracting activity: "recruiting, soliciting, hiring, employing, furnishing, or transporting" of migrant farm workers.

To qualify for AWPA's family business exemption, family members must perform all farm labor contracting activity necessary to operate the farm. Flores identifies three distinct sources of farm labor relied upon by GCC which he considers farm labor contracting activities not performed exclusively by the Schuetts. First, GCC borrowed surplus laborers from neighboring farms. Second, GCC hired workers referred by the Ohio Bureau of Employment Services, a state job placement agency. Third, GCC used its old workers to convey offers of employment to new workers. GCC admits to reliance upon these labor sources, but disputes whether such recruiting techniques constitute farm labor contracting activities performed by non-family members.

1. 29 U.S.C. § 1803(a)(1) provides in pertinent part:
The following persons are not subject to this chapter:
Any individual who engages in a farm labor contracting activity on behalf of a farm· ...
which is owned or operated exclusively by such individual or an immediate family member ..., if such activities are performed only for such operation and exclusively by such individual or an immediate family member....

## II. Borrowing of Workers

In their joint stipulations of fact, both parties agreed that GCC occasionally borrows workers from nearby farms:

> Sometimes, when [GCC] [is] in need of additional workers for an unusually busy day, [the Schuetts] will call a neighboring farm and ask the farmer or the farmer's crewleader if they have any people who are not busy that day that can work for [GCC] that particular day, and to make sure that the other farmer does not need the workers that day. If there are workers available, [the Schuetts] will go to the farmer's labor camp and ask the workers to come work for [GCC] for the day.

Joint Stipulation No. 11.

█ Flores argues that borrowing of workers defeats GCC's family business exemption because these laborers are supplied through a non-family member's contracting activity. Insisting that these workers are only in Ohio—and thus available to be borrowed—as a result of labor contracting activity performed by GCC's neighbors, Flores contends that such preliminary contracting activity should be attributed to GCC when it hires idle workers from nearby farms.

The district court disagreed with Flores, explaining that other farmers may have brought the workers to Ohio, but that the Schuetts brought these workers to GCC:

> [Flores] argue[s] that the workers are in Ohio and available for [GCC's] operations through someone else's farm labor activities. The Court disagrees. While someone else's labor contracting activities may indeed have brought the workers to Ohio, there is no nexus between the other person's contracting activity and [GCC's] solicitation of workers. The only farm labor contracting activity with some nexus to [GCC] takes place when the Schuetts personally go to the neighboring labor camp, and there is no basis to support [Flores'] contention that this should remove [GCC] from the family business exemption.

We agree with the district court that the labor contracting activities of other farmers cannot be attributed to GCC merely because GCC occasionally hires idle workers from nearby farms. The text of the family business exemption, 29 U.S.C. § 1803(a)(1), *supra* note 1, specifically instructs us to examine the labor contracting activities performed "on behalf of" the family-owned farm. The labor contracting activities that brought the borrowed workers to Ohio, however, were not performed "on behalf of" the Schuetts' farm, and therefore cannot affect GCC's eligibility for the family business exemption. When a neighboring farmer spends time and money bringing workers to Ohio, such activities are clearly performed on the recruiting farmer's behalf, not GCC's.

Unlike Flores, we do not think this case is governed by *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 234–36 (7th Cir. 1983), where a farming corporation was deemed a farm labor contractor because it lent out idle workers for a fee. *De La Fuente* dealt with the *lending* farmer's AWPA liability, whereas the defendant in today's case is the *borrowing* farmer. Furthermore, as the district court in *De La Fuente* noted, the lending farmer in that case actively sought to place the workers at other farms. *De La Fuente v. Stokely–Van Camp, Inc.*, 514 F.Supp. 68, 72 (C.D.Ill.1981). In stark contrast, the neighboring farmers in this case took no active role in the placement of their idle workers. As the parties stipulated, the Schuetts initiated all contact with the lending farmers. Once the Schuetts "ma[de] sure that the other farmer [did] not need the workers that day," they went "to the farmer's labor camp and ask[ed] the workers to come work for [GCC] for the day." Joint Stipulation No. 11, *supra.* By negotiating directly with the workers, the Schuetts exclusively performed all of their own farm labor contracting activities, as the family business exemption requires.

Allowing GCC to hire idle workers from other farms without losing its family business exemption comports not only with the text, but also with the spirit, of AWPA. Flores suggests no way in which the challenged practice of borrowing threatens workers. We perceive little risk of abuse resulting from the hiring of surplus laborers from other farms because the Schuetts directly negotiate a contract of employment with each

worker. In fact, rather than posing some threat of harm, the practice of borrowing actually benefits idle workers by providing them with income at times when they would otherwise earn nothing. From this perspective, it is clear that the Schuetts' borrowing of workers poses none of the risk of exploitation that AWPA seeks to prevent.

### III. The Ohio Bureau of Employment Services

Congress passed the Wagner–Peyser Act of 1933 "[i]n order to promote the establishment and maintenance of a national system of public employment offices." 29 U.S.C. § 49. To encourage the creation of employment agencies at the state level, the Wagner–Peyser Act provides federal funding to any state submitting an acceptable organizational plan to the Department of Labor. 29 U.S.C. § 49g. The Ohio Bureau of Employment Services ("OBES") was established pursuant to the Wagner–Peyser Act.

By providing job-seekers with access to a nationwide database of job listings, the Wagner–Peyser Act's employment service "improve[s] the functioning of the nation's labor markets by bringing together individuals who are seeking employment and employers who are seeking workers." 20 C.F.R. § 652.2 (1994). As one court has explained, "[t]he objective of the Act [i]s to develop a national system of employment offices" which "connect the unemployed worker with a job." *Frederick Cty. Fruit Growers' Ass'n v. Marshall,* 436 F.Supp. 218, 220 (W.D.Va.1977).

■ GCC admits to hiring farm workers referred by OBES. As the parties have stipulated, GCC's "interactions with OBES are a two-way street." Joint Stipulation No. 9. On some occasions, administrators from OBES will contact GCC in an effort to place particular workers. On other occasions, GCC will contact OBES to post job listings.

The proper treatment of state employment services under AWPA has not been addressed by any court of appeals.[2] Reasoning that OBES is merely "a state employment agency" which "bring[s] employers and applicants together," the district court determined that GCC did not lose its family business exemption by accepting OBES referrals. Perceiving little risk that exploitation would result from OBES' job placement efforts, the court suggested that "its ruling on this point is faithful to" AWPA's goal of protecting both workers and farmers.

In order to construe OBES referrals as a contracting activity, Flores recites the dictionary definitions for the verbs "to recruit," "to solicit," and "to furnish," which are three of the examples of farm labor contracting activity listed in 29 U.S.C. § 1802(6), *supra.* According to the definitions he has selected from the dictionary he prefers, Flores explains that "to recruit" means "to secure the services of," "to solicit" means "to move to action," and "to furnish" means "to provide with what is needed." Without suggesting that the relationship between OBES and GCC was *contractual* in any way, Flores nevertheless insists that OBES referrals must be considered non-family farm labor contracting activity because these referrals fit his dictionary definition of recruiting, soliciting, or furnishing farm labor.

We find Flores' dictionary-dependent argument unpersuasive for two reasons. First, the only authority justifying such inordinate reliance on the dictionary is a regulation promulgated under AWPA's predecessor, the Farm Labor Contractor Registration Act of 1963 ("FLCRA"). *See* 29 C.F.R. § 41.7 (1966) (using a dictionary to aid interpretation of FLCRA). However, FLCRA has been repealed, Pub.L. No. 97–470, § 523, 96 Stat. 2583, 2600 (1983), and its regulations have been replaced. 56 Fed.Reg. 54,786 (1991) ("remov[ing] the regulations found at 29 CFR parts 40 and 41," because they "do

---

2. The use of state employment services has arisen in two "family business exemption" cases at the district court level, and these two opinions appear to reach conflicting results. In *Coronado v. Selkirk,* 113 Lab.Cas. (CCH) ¶ 35,283, 1989 WL 161165 (W.D.Mich.1989), the district court did not consider the farmer's use of the Michigan Employment Security Commission's Job Service to be an impediment to claiming the family business exemption. In contrast, the district court in *Martinez v. Hauch,* 838 F.Supp. 1209 (W.D.Mich. 1993), ruled that a farmer could not claim the family business exemption after hiring workers referred by the very same agency.

not affect the current operation of any program"). We see no reason to use withdrawn regulations from a repealed statute as a guide to interpret a new statute which expressly provides for its own regulations. *See* 29 U.S.C. § 1861 (authorizing AWPA regulations). The current regulation expressing the Secretary's interpretation of "farm labor contracting activity" merely recites the definition found in the statute. 29 C.F.R. § 500.-20(i).

Our second reason for refusing to "make a fortress out of the dictionary," *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945) (Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), is our fundamental disagreement with Flores' acontextual approach to statutory interpretation. Laws cannot be interpreted by snatching single words out of statutory sentences and matching these words—without regard for context—up against one of the many definitions of that word found in the advocate's dictionary of choice. By splintering the text for purposes of statutory construction, Flores "overlooks, we think, th[e] fundamental principle of statutory construction (and indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States,* — U.S ——, ——, 113 S.Ct. 1993, 1996, 124 L.Ed.2d 44 (1993).

Flores looks to the definitions of recruiting, soliciting, and furnishing, as those words might be used in casual conversation, without regard for the contractual context in which the exemption applies. But the words recruiting, soliciting, and furnishing are only relevant to our analysis as examples of labor contracting activity which the farm family must exclusively perform to be exempt. As the court in *Calderon* noted, all six practices listed by Congress as examples of farm labor contracting activity are distinctly *contractual* in nature:

> This definition collects a number of contractual endeavors: making a contract of employment ("hiring"), maintaining a worker in the labor force ("employing"), preparing to do these things ("recruiting" and "soliciting"), and doing them for others ("furnishing"). The final term in this se-

quence, "transporting," can be understood as still another contractual activity: obtaining and paying for a ticket that brings the worker to the farm or sends him to the next one. So understood, "farm labor contracting activity" covers the hiring and management of workers, the subject collectively called labor relations.

999 F.2d at 1103–04.

Interpreting these words within their proper context—the hiring and management of workers—we agree with the district court that OBES referrals do not "recruit, solicit, or furnish" farms with labor in any contractual sense. The OBES is a state agency that simply helps job-seekers locate prospective employers. The agency charges no fee for its services, and does not purport to represent either the employee or the employer. Both the farmer and the worker remain free at all times to accept or reject any of the agency's recommendations. An agency referral provides the worker with absolutely no assurance of employment—it merely provides the worker with a chance to find a job at a farm in need of labor. Within this framework, OBES job referrals plainly do not constitute non-family farm labor contracting activities.

Mindful of AWPA's protective goals, we see no reason to deter family farmers from using the public employment service when the challenged practice poses no threat to workers. Neither Flores nor his *amici* have suggested a single way in which the activities of the OBES expose the workers to any risk of abuse. In fact, the government's presence in the labor market can only serve to protect workers like Flores. The effectiveness of the public employment service directly reduces the workers' need to rely on potentially-abusive crew leaders to find agricultural employment. Furthermore, federal regulations require employers who wish to use a public employment service to comply with all relevant labor laws:

> The facilities ... of the U.S. Employment Service, including the State agencies, authorized by the Wagner–Peyser Act may

be denied to any person found ... to have violated any employment-related laws....

29 C.F.R. 500.1(f).

Flores contends that the Secretary of Labor agrees with his stance regarding the proper treatment of state employment agencies under AWPA. Citing our recent decision in *Smith v. Babcock,* 19 F.3d 257, 260–61 (6th Cir.1994), he suggests that the strong federal policy of deference to agency interpretations requires us to adopt what he calls the Secretary's view of the statute. Yet even the broadest policy of deference must have limits, and certainly no version of that doctrine permits an agency to revise the text of a statute. As Justice White has explained:

> The interpretation put on the statute by the agency charged with administering it is entitled to deference, but the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.

*Federal Election Comm'n v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981) (citations omitted).

Over a decade later, Justice Kennedy once again confirmed that "the clear meaning of statutes as written" ultimately trumps the policy of "judicial deference to a reasonable statutory interpretation by an administering agency." *Estate of Cowart v. Nicklos Drilling Co.,* —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). Because Congress has spoken to the issue at hand with sufficient clarity to dictate the result we reach today, we cannot defer to an administrator who would contradict that legislative will. Accordingly, we agree with the district court that GCC's acceptance of OBES referrals does not affect the farm's eligibility for the family business exemption.

## IV. Word of Mouth Referrals

Although GCC, unlike many farms, does not require its employees to assist in recruiting, GCC's farm workers have often taken the initiative in referring job-seekers to John and Jerry Schuett. Flores argues that these referrals constitute farm labor contracting activity not exclusively performed by members of the Schuett family. The parties stipulated to the following description of the impact "word of mouth" referrals have on GCC's operations:

> At times, some of [GCC's] current workers call [the Schuetts] to say that they know a good family of migrant farmworkers that is interested in working for [GCC] and ask if there is work available for the family. If [GCC] need[s] additional workers and ha[s] housing available for a new family, [the Schuetts] tell the caller that the family can come. If [the Schuetts] don't know whether they will need additional workers, [the Schuetts] tell the caller to have the family contact [them] before the season begins to see if [GCC] may need workers at that time. None of [GCC's] workers have the authority to hire any workers for [GCC].

Joint Stipulation No. 10.

Jose Flores was referred to GCC by Reyes Rios. According to the stipulations, Flores went to Rios' house in April of 1989 "to discus[s] working for Gibsonburg Canning." Joint Stipulation No. 23. During this meeting, "Flores said that his family wanted to work for Gibsonburg Canning and asked Rios to call the Schuetts to see if the Flores family could work for defendants." *Id.* Rios then called Jerry Schuett:

> Within the next few days, Reyes Rios called Jerry Schuett to ask if there was work and housing available for the Flores family. Jerry asked Rios how many workers there were in the Flores family and Rios told him that the Flores family had five workers. Jerry then told Rios that there was work and housing available.

Joint Stipulation No. 24.

Flores argues that Rios' job placement efforts should be considered a non-family farm labor contracting activity which defeats GCC's family business exemption. In contrast, the district court believed that word of mouth referrals do not constitute non-family labor contracting activity because the

Schuetts never authorized Rios to hire workers:

> The stipulated facts do not set forth that Reyes Rios or any other employee ever had the actual or apparent authority to hire anyone, but rather, that current employees might inquire as to whether work was available for another family. [The Schuetts] would give the current employee an answer, which would then be relayed to the prospective workers.

This court has analyzed the relationship between word of mouth referrals and the family business exemption once previously. In *Bueno v. Mattner, supra,* we recognized that farm employees impact the recruiting process in a variety of ways, some of which affect eligibility for the exemption, and others of which do not. On one hand, the court in *Bueno* determined that a farmer's specific delegation of recruiting authority to an employee wrecked the farmer's eligibility for the exemption. *Id.* at 1383–84. Delegation of such authority often eliminates all direct contact between the agricultural employer and the farm worker, and thus creates an untenable potential for abuse. On the other hand, the court in *Bueno* also determined that an employee's "gratuitous recommendation" that the farmer consider hiring a friend had no affect on the farmer's eligibility for the exemption. Such recommendations are beyond the farmer's control, and therefore cannot affect the farmer's exempt status. *Bueno,* 829 F.2d at 1384 n. 3.

The only other court of appeals to address this issue, the Seventh Circuit, also analyzed eligibility for the exemption in terms of the employee's role in the recruiting process. *See Calderon v. Witvoet, supra,* 999 F.2d at 1105. Like the court in *Bueno,* the court in *Calderon* determined that a purposeful delegation of recruiting authority would defeat the exemption, while a worker's unprompted referrals would not:

> What workers tell their friends is beyond the owners' control, and treating such activities as "farm labor contracting activities" would gut the exemption—for it is impossible to suppress word-of-mouth reports about the job.... The ensuing trial must focus on the [farmers'] own decisions and actions—including the choice, if they made one, to delegate recruitment and hiring to the foremen. Events beyond the owners' control do not affect the availability of the family farm exemption.

999 F.2d at 1105.

The case at bar is more difficult than *Bueno* because the recruiting practice Flores challenges was neither a sweeping delegation of authority, nor a mere gratuitous recommendation. As the parties have stipulated, no GCC employees have general hiring authority. Joint Stipulation No. 10, *supra.* But the circumstances surrounding the hiring of Flores placed Reyes Rios in a much more significant role than the hypothetical gratuitous recommender. Looking back to the parties' stipulated facts, we see that Rios not only recommended Flores for employment, but was also *solely responsible* for conveying the resulting offer of employment to Flores and his family:

> At Rios' house, Jose Flores ... asked Rios to call the Schuetts to see if the Flores family could work for [GCC]....
>
> Within the next few days, Reyes Rios called Jerry Schuett to ask if there was work and housing available for the Flores family.... Jerry then told Rios that there was work and housing available....
>
> Rios later told Jose Flores that he had called [GCC] and that there was work available.... Rios also told Flores the date that the Rios family was leaving Texas to go to Ohio....
>
> *[The Schuetts] did not have any conversations or contact with [the Flores family] prior to arriving at [GCC]. It was understood, however, that if the [Flores family] arrived at the cannery in Ohio in time to transplant tomatoes, [GCC] would give them a job and provide them housing in [GCC's] labor camp....*
>
> [The Flores family] drove to Ohio ... and began working for [GCC]....

Joint Stipulations Nos. 23–25, 27–28 (emphasis added).

■ The district court below properly understood that courts analyzing a farmer's eligibility for the exemption must focus upon the delegation of authority. *Bueno,* 829 F.2d

at 1383–84; *Calderon,* 999 F.2d at 1105; *Martinez,* 1991 WL 84473, at \*16. But the court failed to appreciate that Rios must have wielded authority if GCC was able to hire the Flores family *without ever speaking to them.* In the district court's view, the fact that Rios merely "relayed" messages between the contracting parties undercut any suggestion of delegated authority. In contrast, we believe that the formation of a binding employment contract—in the absence of *any* direct contact between Schuett and Flores—*necessitates* the delegation of some authority. An absent principal simply cannot contract with a third party without delegating authority. The conclusory language of Joint Stipulation No. 10, *supra,* which opines that "[n]one of [GCC's] workers have the authority to hire," simply cannot contradict the more specific factual concessions GCC has made in other stipulations. Taken as a whole, these stipulations reveal that Rios, like the employee in *Martinez v. Shinn,* "informed" the farmer "that [he] had ... people wanting to work," and was told in return "to bring them and that they would be hired." *Id.,* 1991 WL 84473, at \*16. By submitting Flores' job application, by vouching for Flores as a good farm worker, and by relaying the ensuing offer of employment, Rios played a far more influential role in the recruiting process than some disinterested maker of gratuitous recommendations. We cannot avoid concluding that Rios performed farm labor contracting activity on GCC's behalf, as the exemption forbids.

Our ruling in this case not only finds support in *Bueno, Calderon,* and *Martinez,* but also delicately reconciles the oft-conflicting goals of protecting farm workers from abuse and protecting farmers from needless litigation. The Schuetts must lose their exemption in this case because they have induced Flores to move his family across the country without ever speaking to him. Upon their arrival in Ohio, Flores and his family stood utterly at the Schuetts' mercy, and the Schuetts could have inflicted unacceptable hardship by reneging on the offer of employment, or by varying the terms or conditions of that offer. That is why the family business exemption only applies to farmers who personally conduct their own farm labor con-

tracting activity. If the Schuetts wish to remain exempt, they are fully empowered to do so—by speaking directly to the employee they are hiring. It is not Rios' recommendation, but rather the lack of *any* direct contact between the employer and the migrant worker, that cost GCC its exemption. Only by interpreting the exemption in this way can *both* the worker and the farmer avail themselves of the protections Congress intended. Accordingly, we conclude that the Schuetts' use of Rios to hire Flores, and to instruct Flores to move his family from Texas to Ohio, must be considered a non-family farm labor contracting activity which defeats GCC's family business exemption.

For the foregoing reasons, the judgment below is REVERSED and REMANDED for further proceedings in the district court consistent with this opinion.

RYAN, Circuit Judge, concurring in the judgment.

Although I agree that the Gibsonburg Canning Company (GCC) has lost its family business exemption, I reach this conclusion on grounds that differ from the majority's. I therefore write separately to register my respectful disagreement with my colleagues' reasoning.

Rios's actions, from the stipulated facts, do not constitute "a farm labor contracting activity on behalf of" the GCC. 29 U.S.C. § 1803(a)(1). The majority opinion recognizes "that a purposeful delegation of recruiting authority would defeat the exemption, while a worker's unprompted referrals would not," and that the inquiry " 'must focus on the [farmers'] own decisions and actions,' " maj. op. at 515 (quoting *Calderon v. Witvoet,* 999 F.2d 1101, 1105 (7th Cir.1993)).

Here, the plaintiffs inquired, on their own initiative, about the availability of Ohio farm jobs. The plaintiffs, again on their own initiative, asked Rios to call the Schuetts. Rios then called and asked Jerry Schuett whether jobs and housing were available for the Flores family. These facts do not in any way suggest that the GCC delegated, expressly or impliedly, any authority to Rios. The stipulated facts do not indicate that the GCC had

ever hired workers whom Rios mentioned or that the GCC prompted Rios to disseminate information about the farm. In short, Jerry Schuett merely answered Rios's questions; this civil gesture did not authorize Rios to recruit, solicit, hire, employ, furnish, or transport Flores. I would hold that Rios did not engage in "a farm labor contracting activity on behalf of" the GCC because it neither authorized nor could prevent Rios's discussions with the plaintiffs.

However, the GCC did lose the family business exemption when the Ohio Bureau of Employment Services (OBES) "furnished" migrant workers to the farm. According to the stipulated facts, when the farm's operation requires additional workers, the Schuetts occasionally call the OBES to see if the OBES has any available farm workers. Presumably, the OBES creates a pool of unemployed workers specifically qualified for farm work by sorting through the universe of unemployed workers who have come to the bureau's attention. The OBES then matches the unemployed farm worker to the Schuetts' request. This is "furnishing" workers to the GCC in the plain and common understanding of the word.

My colleague asserts that the OBES does not furnish the GCC with workers "in any contractual sense." He points out that the OBES does not charge a fee, does not purport to represent either the GCC or the worker, and does not guarantee employment upon referral. It is, of course, evident under the statute that the OBES has no "contractual" relationship with the Schuetts or with the migrant workers it refers to the Schuetts. In all events, those activities are inessential to concluding that the OBES furnished workers in a "contractual" sense: the OBES screens workers and supplies them to the farm in order for the farm and the worker to then enter into an employment contract. The majority opinion's critique of the plaintiffs' reliance on dictionary definitions misses the mark. In most cases, the dictionary provides helpful guidance as to the undisputed plain meaning of words—in this case, "furnish."

Finally, contrary to the majority's suggestion, it is irrelevant that the OBES may in fact behave as the most conscientious labor contractor ever to serve a migrant worker. The statute's language prohibits *any* nonfamily member from engaging in "a farm labor contracting activity on behalf of" the GCC. Once the actor is identified as a *nonfamily* member, the actor's benevolent nature is immaterial. Rather, the statute directs our attention to the nature of the "activity." That Congress chose sweeping language to define the activities that must be performed by family members is not the concern of this court. Indeed, Congress may have purposefully raised an overprotective shield so that cases at the margins would result in triggering the disclosure and record keeping requirements—even at the expense of including well-meaning labor contractors. It is such guessing at unwritten and obscure purposes that counsels us to remain faithful to the statutory text.

I would hold that the OBES's furnishing of migrant workers to the GCC destroyed the GCC's family business exemption.