Crispin CALDERON, et al., on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

v.

Jim WITVOET, Sr., et al., doing business as J & B Vegetables, Defendants–Appellants.

No. 92–3231.

United States Court of Appeals, Seventh Circuit.

Argued May 7, 1993.

Decided July 16, 1993.

Vincent H. Beckman (argued), Jean Agathen, Blair Craddock, Pasquale Lombardo, Susan Compernolle, Legal Assistance Foundation, Chicago, IL, for plaintiffs-appellees.

Christopher W. Bohlen (argued), Blanke, Norden, Barmann, Kramer & Bohlen, Kankakee, IL, for defendants-appellants.

Before BAUER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Vegetable farmers in central Illinois employed migrant labor without following the standards established by the Migrant and Seasonal Agricultural Worker Protection Act of 1983 (AWPA), 29 U.S.C. §§ 1801–72. The principal question on this appeal is whether the Witvoet family is entitled to the exemption that § 4(a)(1) of the AWPA, 29 U.S.C. § 1803(a)(1), provides for family farms. The district judge held that it is not, as a matter of law, 764 F.Supp. 536 (C.D.Ill.1991), and directed the Witvoets to pay damages and comply with the statute in future years. Other questions, concerning Social Security taxes, minimum wages, damages, and the statute of limitations also were resolved uniformly in plaintiffs' favor, some by summary judgment and some after a bench trial.

## I

Jim Witvoet, Sr., and his wife Beverly run a farm called J & B Vegetables. The farm depends on seasonal labor. During the years in question the Witvoets employed approximately 35 workers per growing season. Not all of the workers stayed from planting through harvest, but the average complement made the Witvoets' operation too big to qualify for the "small business" exemption from the AWPA and the Fair Labor Standards Act, which use the same criteria. 29 U.S.C. § 1803(a)(2), incorporating 29 U.S.C. § 213(a)(6)(A). Thus the Witvoets had to comply with the AWPA unless they ran a family farm. Section 4(a)(1) includes, among the list of "persons ... not subject to this chapter":

> Any individual who engages in a farm labor contracting activity on behalf of a farm ... which is owned or operated exclusively by such individual or an immediate family member of such individual, if such activities are performed only for such operation and exclusively by such individual or an immediate family member, but without regard to whether such individual has incorporated or otherwise organized for business purposes.

Mr. and Mrs. Witvoet say that they are the sole owners of J & B Vegetables. They operate the farm with the aid of their son Jim Witvoet, Jr., an "immediate family member". The catch is the provision that the "farm labor contracting activity" must be performed "exclusively" by the family.

> The term "farm labor contracting activity" means recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural worker.

Section 3(6), 29 U.S.C. § 1802(6). Thus the family owning the farm need not plant or harvest the crops, but the family must carry out all "recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural worker."

According to the district court, the Witvoets flunk the statutory test because they are not the exclusive sources of transportation. What does it mean to say in § 3(6) that "farm labor contracting activity" means "transporting" a migrant worker? Taken to an extreme, this could mean that the farm's owner must drive his own car hither and yon throughout North America, picking up the migrant workers and driving them back to the farm. Letting an airline or railroad bear the worker from one state to another would mean that the owner had not been the "exclusive" supplier of transportation. But this reading would make § 4(a)(1) a statutory mirage. Migrant workers use their own cars or common carriers to move from one farm to another. Once *on* the farm, they ride other contraptions. They might, for example, drive tractors or sit in the cab of a truck full of vegetables on the way to market. Again "transporting" must mean something short of all movement, or we have obliterated the exemption.

Plaintiffs, however, have no desire to preserve the family farm exemption. At oral argument counsel told us that if a single migrant worker rides one yard on a tractor, driven by himself or anyone other than a member of the family, the exemption is destroyed. The tractor transports the worker, and unless the family is "exclusively" responsible for transportation, bye bye exemption. A variant of this argument persuaded the district court. The workers do not spend 24 hours a day in the fields. Twice a day, at least, they must move between their housing and the beets or carrots. Those who have their own cars may offer rides to their friends. The rest use the Witvoets' vehicles. A few drive in the farm's trucks. The Witvoets furnish a small bus (seating 15–20 passengers) that crew leaders often use to carry workers. Head crew leader Salomon Calderon regularly drove workers to the nearest town to buy food; he used "one of the trucks that belong to the boss." The district court

held that the Witvoets lost their entitlement to the family farm exemption because they do not drive the bus, trucks, and cars themselves. Another district judge reached the same conclusion under a predecessor to the AWPA. *Marshall v. Buntings' Nurseries, Inc.*, 459 F.Supp. 92, 97 (D.Md.1978). There are no appellate decisions on the question.

The district court's approach, no less than the possibilities with which we began this discussion, eviscerates the family farm exemption. Only a farm of modest size (requiring more than 500 man-days of agricultural labor) seeks shelter in § 4(a)(1); smaller farms elect the small business exemption of § 4(a)(2). A farm large enough to use 500 man-days of hired help, concentrated in the planting and harvest seasons, is too large for the owner to do all the driving. Even a farmer who tried to drive every truck, van, and tractor would be foiled. Sooner or later, a worker is bound to use his own car or hop aboard a tractor—or the crew chief will drive another worker into town to buy groceries.

Some statutes are self destructive, imposing restrictions so severe that no one qualifies for the favor or incurs the penalty. See *Continental Can Co. v. Chicago Truck Drivers Pension Fund*, 916 F.2d 1154 (7th Cir. 1990). Courts do not blot statutes from the books when alternatives are available, however. It is possible but hardly inevitable to read "transporting" as all movement provided or suffered by the owner. Words do not have natural meanings; their scope depends on their context. *Deal v. United States*, —— U.S. ——, ——, 113 S.Ct. 1993, 1996, 124 L.Ed.2d 44 (1993); *Concast, Inc. v. AMCA Systems, Inc.*, 959 F.2d 631 (7th Cir.1992). Recall the language of § 3(6): "The term 'farm labor contracting activity' means recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural worker." This definition collects a number of contractual endeavors: making a contract of employment ("hiring"), maintaining a worker in the labor force ("employing"), preparing to do these things ("recruiting" and "soliciting"), and doing them for others ("furnishing"). The final term in this sequence, "transporting", can be understood as still another contractual activity:

obtaining and paying for a ticket that brings the worker to the farm or sends him on to the next one. So understood, "farm labor contracting activity" covers the hiring and management of workers, the subject collectively called labor relations. This is consistent not only with principles for deriving meaning, see David L. Shapiro, *Continuity and Change in Statutory Interpretation*, 67 N.Y.U.L.Rev. 921, 929–31, 947–50 (1992), but also with the understanding conveyed by § 4(a)(1): that one may run a "family farm" as a manager, without tilling the fields or playing chauffeur to the hired help.

Nothing in the legislative history of § 3(6) or § 4(a)(1) suggests that "transporting" refers to the movement that is inevitable during the course of employment. The Department of Labor has not issued a regulation defining the terms in § 3(6). Another part of the statute, however, deals with vehicles. Section 401, 29 U.S.C. § 1841, requires farms covered by the AWPA to use safe vehicles, operated in a proper manner. Section 401 uses the word "transportation" to refer to all movement in and around the farm; the section is drafted so broadly that Congress thought it necessary to exclude "the transportation of any migrant or seasonal agricultural worker on a tractor, combine, harvester, picker, or other similar machinery ... while such worker is actually engaged in the planting, cultivating, or harvesting of any agricultural commodity". 29 U.S.C. § 1841(a)(2). Plaintiffs ask us to infer that "transporting" throughout the Act has this comprehensive scope. "Transportation" in § 401 includes driving the vans used to move workers between housing and the fields. See also 29 C.F.R. § 500.101(a) ("All transportation of migrant and seasonal agricultural workers, whether on the farm or on the road, shall be subject to the vehicle safety standards of the Act"). If the word means the same in § 3(6), the Witvoets lose the exemption—for bus, van, car, *and tractor* all are "transportation." (The exemption in § 401(a)(2) does not apply to the definition of "farm labor contracting activity" in § 3(6); neither does the regulatory exemption in 29 C.F.R. § 500.103(c) for the workers' carpools.)

Once more, however, plaintiffs' argument depends on divorcing "transporting" in § 3(6) from its context. Section 401 applies only to covered farms. It is circular to use the rules specifying how persons subject to a statute must behave to decide *whether* a given person is subject to that statute. Even a brief tour through a dictionary demonstrates that one word can take multiple meanings. Some words have more than 50 definitions. "Transport" has six definitions in *Webster's Third New International Dictionary* (1961). There are four more for "transportation" and another two for "transported." The word covers banishment to a penal colony ("He was transported to Australia"), being swept away by a natural force ("The glacier transported the rocks all the way from Greenland to the Finger Lakes."), and the emotion of rapture ("Hearing Mozart's sublime String Quartet in C, K. 465, is a transporting experience."). English offers so many possibilities that the same word used twice in the same sentence may convey different meanings. Courts therefore regularly announce that the way a word is used in one section of a statute does not necessarily establish its meaning in some other section. E.g., *Dewsnup v. Timm*, — U.S. —, —, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992); *District of Columbia v. Carter*, 409 U.S. 418, 421, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973); *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 608, 76 L.Ed. 1204 (1932). Usually identical words in different sections mean identical things, *CIR v. Keystone Consolidated Industries, Inc.*, — U.S. —, — – —, 113 S.Ct. 2006, 2011–12, 124 L.Ed.2d 71 (1993), but not invariably. All depends on context. In § 401 Congress created a comprehensive safety statute, written broadly to make it proof against clever maneuvers. But § 4(a)(1) *is* an exception—a loophole, some would call it, but put there deliberately. Reading "transportation" expansively in § 401 serves the function of that section; giving "transporting" the same breadth in § 3(6) would utterly defeat the function of § 4(a)(1).

If, as we believe, "farm labor contracting activities" are a related group of contractual endeavors, collectively denoting the manage-

ment and labor relations of the farm, this does not necessarily carry the day for the Witvoets. They must establish, by proof satisfactory to the trier of fact, that they are indeed the sole owners of the farm and perform all of the "farm labor contracting activity." On these questions they bear the burden. Cf. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974). Plaintiffs contend that crew leader Salomon Calderon hired four of their number and another foreman hired a fifth, which unquestionably would spoil the exemption. The Witvoets deny this, and the district court did not deal with the conflict. Such disputes may not be resolved by summary judgment, so we remand for a trial.

■ One final issue under the AWPA: Plaintiffs contend that the seasonal labor was "recruited" by persons other than the Witvoets. Although plaintiffs are not clear on the subject, they appear to contend that laborers' oral reports of their experiences one season led other migrant workers to appear the next. We doubt that a remark between friends or family members, somewhere in Texas or Mexico, by someone who worked for the Witvoets in 1987, that work might well be available in 1988, counts as "recruiting." What workers tell their friends is beyond the owners' control, and treating such activities as "farm labor contracting activities" would gut the exemption—for it is impossible to suppress word-of-mouth reports about the job. Cf. *EEOC v. Consolidated Service Systems,* 989 F.2d 233 (7th Cir.1993); *EEOC v. Chicago Miniature Lamp Works,* 947 F.2d 292, 305 (7th Cir.1991) (word-of-mouth hiring is not an employment practice and therefore is not subject to disparate impact analysis in discrimination case). The ensuing trial must focus on the Witvoets' own decisions and actions—including the choice, if they made one, to delegate recruitment and hiring to the foremen. Events beyond the owners' control do not affect the availability of the family farm exemption.

## II

Federal laws are shot through with favorable rules for small businesses and family farms. The Witvoets treated themselves as exempt from most regulatory schemes, and even from the obligation to collect and pay Social Security taxes on behalf of their workers. Technically these taxes are imposed by the Federal Insurance Contributions Act (FICA), 26 U.S.C. §§ 3101–28; we use the common term for convenience. The Witvoets withheld and paid the taxes in 1988 but not in earlier or later years. (In 1989 they withheld the taxes but, after concluding that their workers are exempt, did not pay the withheld amounts to the government; they returned the withheld sums to all employees they could locate.) The Witvoets' claim to this exemption depends not on a special rule for family farms but on a statute dealing with the immigration status of the workers. An employer need not pay the Social Security tax attributable to any "service performed by foreign agricultural workers lawfully admitted to the United States ... on a temporary basis to perform agricultural labor." 26 U.S.C. § 3121(b)(1). A parallel provision in the Social Security Act disqualifies such workers from receiving benefits. 42 U.S.C. § 410(a)(1). Following *Moorhead v. United States,* 774 F.2d 936 (9th Cir.1985), the district court held that these statutes apply only to workers holding H–2 visas. Noting that the Witvoets had not offered to show that any of their laborers held H–2 visas (which can be obtained only with the employer's assistance, and on a showing that domestic labor is unavailable), the district judge denied the Witvoets' request for discovery into the plaintiffs' immigration status and granted summary judgment.

■ The district court's opinion, like the parties' briefs, speaks of the Witvoets' failure to pay Social Security taxes. This poses a question of standing. What interest can the plaintiffs have in whether the Witvoets pay their taxes? Cf. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Collection and payment of the tax would have made the workers worse off. Suppose the laborers worked 40 hours per week in 1983 at the (then) minimum wage of $3.35 per hour, for a weekly wage of $134. Withholding of the Social

Security tax of 7.5% would have reduced their take-home pay to $123.95. This difference, presumably, could have been subtracted from any damages otherwise available to the plaintiffs, and the Witvoets would reduce the net pay of the class in future years. A claim filed for the purpose of curtailing one's income does not establish standing, even if it has the collateral effect of requiring one's nemesis to pay a greater sum to the federal government. (The Witvoets would owe not only the employees' 7.5% tax but also the employer's tax, plus interest and penalties.) Standing under Article III requires proof of "injury in fact", see *Lujan v. Defenders of Wildlife*, —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); a higher take-home pay is "boon in fact."

Plaintiffs do have an interest in obtaining benefits under the Social Security Act, including retirement pensions and disability benefits. Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate. Benefits depend on the number of "quarters" in which a person earned income (a minimum of 40 quarters is required for most purposes, 42 U.S.C. § 414; 20 C.F.R. § 404.130) and the level of that income (42 U.S.C. § 415(b)). Benefits do not, however, depend on whether the employer actually paid the taxes. Just as a wage earner is entitled to credit for all income tax deducted from his wages whether or not the employer turns the proceeds over to the United States, *Thomsen v. United States*, 887 F.2d 12, 14 (1st Cir.1989), so the wage earner is entitled to Social Security credit for all sums earned whether or not the employer satisfies its obligations under the FICA. 42 U.S.C. § 413(a)(2)(A)(ii). The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make—they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.

All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income. Whether these reports lead to an assessment of taxes is between the Witvoets and the Commissioner of Internal Revenue. As it turns out, the district court recognized the distinction between requiring the Witvoets to report the plaintiffs' income and requiring them to pay taxes on it. The district court's judgment provides: "The defendants are ordered to file IRS forms W–2, W–3, and 943 to enable the plaintiffs to receive credit within the Social Security System for labor performed in the defendants' employ for the years 1983 through 1987 and 1989 through 1991." Not a word in the judgment requires the Witvoets to pay taxes—something neither side noticed, even though we called for and received supplemental briefs on the standing question. Plaintiffs have standing to enforce the statutory reporting requirements, so we turn to the merits of their claim.

The exemption applies to foreign workers "lawfully admitted to the United States ... on a temporary basis to perform agricultural labor." This implies that the entry must be for a limited time, that the alien must be authorized to work in the United States, and that the work must be confined to agriculture. United States citizens and aliens admitted for permanent residence fall outside the exemption. Temporary admission that permits work depends on a visa. *Moorhead* holds that only a category H–2 visa authorizes temporary admission to perform agricultural work. The Witvoets do not dispute this conclusion, and they do not contend that any of their employees possessed an H–2 visa. Because of the sponsorship requirement for obtaining this visa, the Witvoets would have been the first to know. All the Witvoets argue to us is that they should have had an opportunity to explore during discovery the precise immigration sta-

tus of their workers. Yet such discovery would not have produced or led to any relevant evidence, if as *Moorhead* concludes § 3121(b)(1) refers only to holders of H–2 visas. We agree with the ninth circuit that § 3121(b)(1) does not contemplate a roving inquiry into immigration status—does not, in other words, permit an employer to argue that its workers were in this country temporarily and performed only agricultural work while here. Only aliens lawfully and temporarily admitted to perform agricultural work come within § 3121(b)(1), and only holders of H–2 visas meet that description.

### III

■ The Fair Labor Standards Act lacks an exemption for family farms, and the Witvoets' operation is too extensive for the "small business" exemption in 29 U.S.C. § 213(a)(6)(A). Thus the Witvoets had to pay the minimum wage and comply with the associated requirements of the FLSA. From 1983 through 1985, when the minimum wage was $3.35 per hour, the Witvoets paid ordinary laborers only $3.25 per hour. They concede that this shortfall violated the FLSA. During 1986 and 1987 the stated wage was $3.35 per hour, nominally complying with the statute. In all five years the Witvoets withheld some of the wage from the weekly pay envelope—50¢ per hour from 1983 through 1985 and 25¢ per hour in 1986 and 1987. Thus regular laborers received $2.75 per hour in 1983–85 and $3.10 per hour in 1986–87. The remainder was paid as a "bonus" when the worker left the Witvoets' employ. According to plaintiffs, the Witvoets used this withholding to induce laborers to remain through the harvest and did not pay the "bonus" to employees who left in mid-season. According to the Witvoets, the withholding was a service to the workers, establishing a kitty they could use for transportation to their next job (or back home). The Witvoets insist that they paid the withheld sum on every employee's final day, in mid-season or at the end of the season. The district judge did not resolve this dispute and could not have done so without a trial. Instead he granted summary judgment for the plaintiffs, holding that retaining any part of the minimum wage past the end of the pay period violates the FLSA.

The district court's approach follows directly from cases such as *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). An employer failed to pay time-and-a-half for overtime at the same time as it paid the regular wages. Some time later, the employer recognized this omission and tendered a check for the shortfall. The employee cashed the check and sued for statutory liquidated damages. The Court held that the employee could recover because the FLSA requires the employer to pay *on time*. See also, e.g., *Olson v. Superior Pontiac–GMC, Inc.*, 765 F.2d 1570, 1579, modified, 776 F.2d 265, 267 (11th Cir.1985); 29 C.F.R. § 531.35. The Supreme Court added that the provisions of the FLSA are not waivable. 324 U.S. at 703–07, 65 S.Ct. at 900–02. If the FLSA requires timely payment in cash or a cash equivalent such as a check, and this requirement may not be varied by agreement, it follows that even the workers' enthusiastic assent to deferred payment—a form of employer-held savings account—is ineffectual.

All that the Witvoets have to offer is a submission that employers may deduct sums for the benefit of employees. The two cases the Witvoets cite for this proposition hold no such thing. Each concludes that the employer may not reduce the wage below the statutory minimum to collect a debt to the employer. *Brennan v. Heard*, 491 F.2d 1 (5th Cir.1974); *Brennan v. Veterans Cleaning Service, Inc.*, 482 F.2d 1362 (5th Cir.1973). Both cases recognize that an employer may pay its workers in money's worth as well as in money. So if, for example, the employer furnishes food or housing in lieu of cash, the in-kind payment counts toward the minimum wage. 29 U.S.C. § 203(m). A worker may ask the employer to turn part of his wage over to some third party—for example, to send funds to a relative, to make a deposit in a bank, or to pay dues to a union. See *Veterans Cleaning Service*, 482 F.2d at 1369; 29 C.F.R. § 531.40. A revocable power to appoint one's income to a designated party is the functional equivalent of cash. Yet the Witvoets did not send employees' earnings,

with the employees' consent, to designated third parties. Instead they did exactly what *Brooklyn Savings Bank* says an employer may not do: they paid employees belatedly. The Witvoets could have urged their workers to save part of their weekly wages; the only way to *compel* them to save, as the Witvoets did, is to pay the minimum wage promptly and defer payment of an additional sum.

The district court treated the deferred payments as if they had not been made at all. Thus for 1986–87, when the Witvoets paid $3.10 per hour at the end of each week and another 25¢ per hour as the employee departed, the district court awarded each worker 50¢ per hour, invoking the liquidated damages provision of 29 U.S.C. § 216(b). Equating deferral with nonpayment is problematic. Deferral costs the employee the time value of the money but is less serious than nonpayment. Giving the employer no credit for wages tendered after the close of the pay period would discourage those who recognize their own noncompliance from setting things straight. In *Brooklyn Savings Bank* the trial court gave the employer full credit for wages paid late, awarding only liquidated damages under § 216(b). But the Witvoets have not contested the district court's computation of damages, so we let the matter slide.

■ In one respect, however, the calculation of damages requires a second look by the district court. The Fair Labor Standards Act has a two-year statute of limitations, extended to three if the violation was wilful. 29 U.S.C. § 255(a). This suit was filed in November 1988, so periods before the 1986 growing season are outside the three-year period. (The violation was unquestionably wilful, as that term has been understood, because the Witvoets displayed reckless disregard for the settled interpretation of the FLSA. See *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).) Yet the district court reached back six years, all the way to the beginning of the 1983 season, to award damages.

The only explanation the district court gave for including 1983 through 1985 in this award was that the Witvoets waived the defense of the statute of limitations by not listing it in the final pretrial order as a subject requiring decision. Yet so far as we can see this defense was not an issue for *trial.* There are no material factual disputes—at least none the parties have called to our attention. The Witvoets pleaded the statute of limitations in their answer, as Fed. R.Civ.P. 8(c) requires, and then relied on the statute in opposition to the plaintiffs' motion for summary judgment. The district judge granted the plaintiffs' motion, which sought relief for the period beginning in 1983, without discussing this defense. The opinion recognized that the Witvoets had raised the period of limitations as a defense but thereafter ignored the subject. The judge did not identify any disputed issue of material fact requiring a trial. Indeed, when denying the Witvoets' request for a jury trial, the judge wrote that the only issues for trial concerned equitable relief. It therefore is no surprise that the Witvoets did not attempt to identify in the pretrial order any issue concerning the statute of limitations; the judge had told them, twice, that no such question was open.

Rules concerning timely presentation and forfeiture are designed to ensure that the parties present their arguments at the appropriate time. A response to the plaintiffs' motion for summary judgment was an appropriate way to present the affirmative defense under § 255(a). Requiring defendants to raise such an issue *again* in the pretrial order, when they reasonably believed that there was nothing left for trial, sets a trap for the unwary without advancing the orderly resolution of litigation. Indeed, it would ensnare even wary litigants. Nothing in the Rules of Civil Procedure tells counsel that to preserve issues for appeal they must insert into the pretrial order contentions that have already been rejected by the judge. Most district courts would look askance at any effort to encumber the pretrial order with questions raised and resolved, even if the resolution was unexplained.

**IV**

■ The Witvoets demanded a jury trial. Ruling that the only triable issues concerned equitable relief, the district court denied this request and held a bench trial. That ruling

depended on the fact that the court had resolved the merits by summary judgment. As a result of this opinion there must be a trial on at least one substantive issue. Plaintiffs contend that, having waived any claim to actual damages, they seek only an "equitable" remedy for which a jury is unnecessary. They have invoked 29 U.S.C. § 1854(c)(1), which authorizes courts to award prospective, equitable relief plus an award not exceeding $500 per worker. Whether actions to recover non-compensatory sums fixed by statute are "suits at common law" for purposes of the seventh amendment is a question the Supreme Court has reserved for future decision, *Lorillard v. Pons*, 434 U.S. 575, 577 n. 2, 98 S.Ct. 866, 868 n. 2, 55 L.Ed.2d 40 (1978), and on which the courts of appeals are divided.

Our circuit has concluded that actions seeking liquidated damages provided by statute are "suits at common law" for constitutional purposes. *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1014–17 (7th Cir. 1991). Accord, *Gnossos Music v. Mitken, Inc.*, 653 F.2d 117 (4th Cir.1981). *Video Views* is a copyright case, but we cannot imagine why liquidated damages under the AWPA would be treated differently. That the AWPA creates a new source of legal obligations and remedies does not make juries less available. *Curtis v. Loether*, 415 U.S. 189, 193–96, 94 S.Ct. 1005, 1007–09, 39 L.Ed.2d 260 (1974). We acknowledged in *Video Views* that there are cases the other way. See *Oboler v. Goldin*, 714 F.2d 211 (2d Cir.1983); *Twentieth Century Music Corp. v. Frith*, 645 F.2d 6 (5th Cir.1981); *Raydiola Music v. Revelation Rob, Inc.*, 729 F.Supp. 369 (D.Del.1990). Having considered the arguments fully in *Video Views*, we shall hold fast unless instructed otherwise by the Supreme Court. That institution has been having difficulties of its own defining the meaning of "suits at common law", frequently unable to assemble a majority. E.g., *Teamsters Local 391 v. Terry*, 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). Thus we adhere to the conclusion of *Video Views* that either side may demand a jury trial in a suit seeking statutory liquidated damages. That Congress called such relief "equitable" in § 1854(c)(1) cannot change the outcome; the legislature may not strip parties of their right to jury by applying that label to an action that would have been within the ken of common law courts in 1791. Cf. *Tull v. United States*, 481 U.S. 412, 424, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987).

The Witvoets have not challenged the portion of the judgment requiring them to obtain a state license for their labor camp and to comply with all applicable state laws. That portion of the judgment therefore stands undisturbed. The portion of the judgment requiring the Witvoets to make proper reports of the plaintiffs' earnings is affirmed. The remainder of the judgment is vacated, and the case is remanded for further proceedings to determine: (a) whether the Witvoets are entitled to the family farm exemption from the AWPA (and, if not, what damages are appropriate), and (b) whether there is any basis for an award under the FLSA for periods preceding November 1985.