John F. ROGERS, et al., Plaintiffs–Appellants,

v.

The CITY OF TROY, NEW YORK; David M. Grandeau, in his official capacity as City Manager of the City of Troy, New York, Defendants–Appellees.

No. 2023, Docket 97–7120.

United States Court of Appeals, Second Circuit.

Argued Sept. 26, 1996.

Decided May 22, 1998.

---

Mark T. Walsh, Gleason, Dunn, Walsh & O'Shea, Albany, NY, for Plaintiffs–Appellants.

Patrick Morphy, Troy, NY (Richard T. Morrisey, Deputy Corp. Counsel for City of Troy, on brief), for Defendant–Appellee.

Before: MESKILL, CALABRESI, Circuit Judges, and KOELTL, District Judge.[*]

CALABRESI, Circuit Judge:

The plaintiffs appeal from a judgment of the United States District Court for the Northern District of New York (Thomas J. McAvoy, *Chief Judge*) dismissing their complaint for failure to state a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* The issue on this appeal is whether an employer can, without violating the FLSA, pay its employees later than the contractually agreed upon payday, if that late payment is due to the employer's good faith effort to make a permanent change in its pay schedule. We hold that an employer can make such a change without violating the FLSA, but that the plaintiffs' claim should not have been dismissed on the pleadings. Accordingly, we vacate and remand.

## I. BACKGROUND

The plaintiffs are police officers and former police officers employed by the City of Troy. They started this action in December 1994, alleging that the City violated the minimum wage provisions of the FLSA when, during the months of October, November, and December 1994, it gradually changed the pay schedule of its employees and implemented a lagged biweekly payroll in place of the weekly one previously used. The City stated that it altered the pay schedule in order to increase the efficiency of its payroll operation.

Under the old pay system, the City's employees had been paid every Friday, but in accordance with two disparate systems of payroll accounting. The pay schedule for "forty hour" civilian employees had been lagged—*i.e.*, on any given Friday, they were paid for work performed in the week prior to the one that was just ending. The pay schedule for police officers (and certain other employees, such as fire fighters) instead was not significantly lagged—*i.e.*, on any given Friday, the officers were paid for the work they had performed in the week that was nearing completion.

The City decided that having two separate pay systems was inefficient. In addition, the City felt that the payroll staff, which had to prepare the paychecks for non-lagged workers well before the relevant pay period was over, spent too much time estimating the number of hours that non-lagged employees would work in the relevant week, and then spent yet more time—during the following week—adjusting the paychecks to reflect the hours that had actually been worked in the earlier week. Finally, the City determined that it would save money by computing and issuing paychecks once every two weeks, rather than once every week. As a result of these administrative concerns, the City claims, it decided to put all employees on a biweekly, lagged payroll.

To implement the lag, the plaintiffs' pay was delayed by one day each week for five weeks. Once the week-long lag had been phased in, the switch to the biweekly pay system was made. The plaintiffs claim that they are entitled to a week's worth of pay in liquidated damages for each of the five weeks in which they were paid one additional day late while the new pay schedule was being phased in.

At approximately the same time that the officers filed this federal lawsuit, their union, the Troy Police Benevolent and Protective Association, filed for arbitration pursuant to the contract between the union and the City. In that proceeding, the union argued that, under their contract, the officers were entitled to be paid certain wages for the period between January 1, 1994, and December 31, 1994, and that, as a result of the new pay schedule, the officers were not paid on time for one week of work performed in 1994. In other words, they alleged that by December 31, 1994, they had actually received only

---

[*] The Honorable John G. Koeltl, United States District Judge of the Southern District of New York, sitting by designation.

51/52 of the annual salary provided for in their contract. This, they contended, violated that agreement. The union also asserted that the City had a contractual obligation to pay the officers on a weekly, unlagged schedule. The union acknowledged that the contract was silent both as to the length of the pay period and as to the frequency of paychecks. But it contended that the City's longstanding weekly payment of unlagged paychecks—every Friday over an eighteen year period—constituted a past practice that was strong enough to rise to the status of a contractual right.

The arbitrator accepted the union's arguments and concluded that the implementation of the lagged biweekly pay schedule had violated the labor contract. The arbitrator therefore ordered the City to reimburse the officers for one week's lagged wages and to return to the prior weekly unlagged pay schedule. The arbitrator's order was subsequently affirmed by the state courts. *See In re Arbitration between Troy Police Benevolent & Protective Ass'n, Inc.*, 223 A.D.2d 995, 996, 636 N.Y.S.2d 499, 501 (1996).

In December 1996, the district court, pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissed the plaintiffs' FLSA complaint for failure to state a claim. *See Rogers v. City of Troy*, 949 F.Supp. 118, 126 (N.D.N.Y.1996). The court held that the employer's failure to pay its employees promptly on their regular payday did not in this case violate the FLSA since the late payment occurred as a result of the employer's change of the regular payday, which was intended to be permanent and was not designed to evade the substantive wage and hour requirements of the Act. The officers appealed.

## II. DISCUSSION

The FLSA provides that "[e]very employer shall pay to each of his employees ... who in any workweek is engaged in commerce or in the production of goods for commerce ... not less than the minimum wage." 29 U.S.C. § 206(b). The Act does not specify *when* this wage must be paid. The officers

contend that it must be paid on the contractual pay date. The City, while acknowledging that wages must be paid in a timely fashion, argues that the FLSA is not violated when the pay date is permanently changed for legitimate business reasons.

We agree with the district court, and hold that, although the FLSA does include a prompt payment requirement, that requirement is not violated when an employer changes its pay schedule so long as this change: (a) is made for a legitimate business purpose; (b) does not result in an unreasonably long delay in payment; (c) is intended to be permanent; and (d) does not result in violation of the substantive minimum wage or overtime provisions of the FLSA. But since the plaintiffs' complaint alleges facts that, if proven true, would show that the City of Troy's actions did not satisfy this test, we hold that the complaint should not have been dismissed pursuant to Rule 12(b)(6).

### A. Prior Cases

Although the FLSA does not explicitly require that wages be paid on time, the courts have long interpreted the statute to include a prompt payment requirement. *See, e.g., United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 491 (2d Cir.1960) ("While the FLSA does not expressly set forth a requirement of prompt payment, such a requirement is clearly established by the authorities...."). More than fifty years ago, the Supreme Court explained that the Act's liquidated damages provision

constitutes a Congressional recognition that failure to pay the statutory minimum on time may be so detrimental to maintenance of the minimum standard of living 'necessary for health, efficiency and general well-being of workers' and to the free flow of commerce, that double payment must be made in the event of delay in order to insure restoration of the worker to that minimum standard of well-being.

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) (footnote omitted).[1]

---

1. The Court further noted that "[t]he necessity of prompt payment to workers of wages has long

been recognized by Congress as well as by state legislatures." *Brooklyn Sav. Bank*, 324 U.S. at

*Brooklyn Savings Bank* concerned a night watchman, Mr. O'Neil, who was employed by Brooklyn Savings Bank from November 1938 until August 1940. During that time, O'Neil frequently worked overtime, but was never paid an overtime wage as required by the FLSA. In November 1942—more than two years after O'Neil had left the Bank's service—the Bank computed the overtime wage that he was due and offered him a check for that amount in exchange for his signing a release of his rights under the FLSA. *See id.* at 700, 65 S.Ct. 895. Under the Act, he would have been entitled to liquidated damages in addition to the overdue wages.[2] O'Neil accepted the check and signed the waiver; later, however, he sued and the Bank raised the waiver as a defense. *See id.*

The Court held that the waiver was invalid, concluding that "the same policy considerations which forbid waiver of basic minimum and overtime wages under the Act also prohibit waiver of the employee's right to liquidated damages." *Id.* at 707, 65 S.Ct. 895. Accordingly, the Court held that O'Neil was entitled to statutory damages despite the fact that he had been paid his full wages prior to instituting his lawsuit.

Subsequent courts have interpreted *Brooklyn Savings Bank* to mean that "the FLSA requires the employer to pay *on time.*" *Calderon v. Witvoet*, 999 F.2d 1101, 1107 (7th Cir.1993). In *Calderon*, the defendants operated a farm and employed seasonal farmhands. These farmhands received less than the minimum wage in each pay check. Those who stayed until the end of the season were paid a "bonus" to bring their total wages up to the minimum hourly rate specified by the FLSA. The plaintiffs in *Calderon*

alleged that workers who left before the season was over did not receive their full wages. *See id.* The employer contended that the employees had agreed to this scheme, and that the withholding was actually of service to them because it acted as a savings account. The court held that this practice violated the Act, stating that "[i]f the FLSA requires timely payment in cash or a cash equivalent such as a check, and this requirement may not be varied by agreement, it follows that even the workers' enthusiastic assent to deferred payment—a form of employer-held savings account—is ineffectual." *Id.*

Similarly, in *Klinghoffer Brothers Realty*, the Second Circuit held that the FLSA was violated in a case in which an employer required four employees to perform overtime work. The employees were only to be paid for this extra work when the company emerged from bankruptcy proceedings. *See Klinghoffer Bros. Realty Corp.*, 285 F.2d at 489–90. We noted that the employees had nothing more than "a vague understanding that at some indefinite future date . . . they would be taken care of" and that "[a]t the time the present prosecution was commenced they had been unpaid for approximately a year." *Id.* at 491. We concluded that "[s]uch delayed payment does not meet the requirements" of the FLSA. *Id.*

While these cases are instructive, they arose in fundamentally different circumstances from those in the instant case. The earlier cases all involved substantial delays in payment, and—more important—the practices disapproved of resulted in evasions of the minimum wage and overtime provisions of the FLSA.[3] None of them addressed a

---

707 n. 20, 65 S.Ct. 895 (citing state and federal statutes other than the FLSA, such as the federal longshoremen's workers' compensation statute, that required payments to be made within a certain time period).

2. At that time, liquidated damages were compulsory under the FLSA. Since 1947, there has been a good faith exception under which employers who reasonably did not believe that their actions violated the FLSA may escape double damages. *See* 29 U.S.C. § 260. That exception has been construed narrowly, however. *See, e.g., Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir.1997).

3. The only case that arguably does not fall within this paradigm is the Ninth Circuit's decision in *Biggs v. Wilson*, 1 F.3d 1537 (9th Cir.1993). In *Biggs*, the court held that the FLSA's prompt payment requirement was violated when the State of California paid its employees two weeks late because of a budgetary impasse in the state legislature. *See id.* at 1538. Admittedly, the employer in *Biggs* did not seek to evade the minimum wage and overtime provisions of the FLSA. At the same time, however, the late payment in that case was not part of a permanent change in the pay schedule. Moreover, the change in the pay schedule was not made for a good faith business purpose. Thus, *Biggs* in no

situation in which an employer has made a permanent change in its payroll schedule for a valid business purpose, which—both during the transition to the change and after it was in place—still yielded wages that conformed with the minimum wage and overtime provisions of the Act.

■ Two governing principles of law that are relevant to the case before us do, however, emerge from these earlier cases. First, it is clear that the FLSA requires wages to be paid in a timely fashion. Second, the cases demonstrate that what constitutes timely payment must be determined by objective standards—and not solely by reference to the parties' contractual arrangements. Indeed, to link the statutory obligations under the FLSA to the parties' collective bargaining agreement would be contrary to the whole thrust of the statute, which "was not designed to codify or perpetuate [industry] customs and contracts" but "to achieve a uniform national policy" in terms of wages and hours. *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 741, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (internal quotation marks and citation omitted). The FLSA sets a national "floor" in terms of working conditions, in order to protect workers from the substandard wages and excessive hours that might otherwise result from the free market. Parties may, of course, contract for additional rights above those guaranteed by the statute. But the existence of the FLSA does not convert every suit involving the breach of an employment contract into a federal case. Accordingly, while waiver or agreement does not insulate a practice from being held to be a violation of the FLSA, neither does a violation occur simply because a practice breaches a worker's collective bargaining agreement.[4]

way contradicts the result we reach today. To the extent, however, that there are inconsistencies between our *reasoning* and the reasoning of the Ninth Circuit in *Biggs,* we respectfully decline to follow that Circuit's opinion.

4. This does not mean that the contractual pay date will never be relevant. When an employer breaches its contract by paying its employees late, and such late payment is not due to a

*B.  Agency Interpretation*

■ Because the statute does not explicitly address the prompt payment requirement, let alone the particular twist on it that is before us, we hold that the statute is ambiguous. It is, therefore, appropriate to consider the views of the administrative agency charged with the law's enforcement. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Two pronouncements from the Department of Labor support our reading of the FLSA.

First, during the course of this litigation, the district director of the Department of Labor's Wage and Hour Division issued an informal opinion letter regarding "the City's conversion from a weekly payroll, paid on Friday of the same week, to a biweekly payroll with a one-week lag." This letter stated that there was "no conflict between the FLSA and [the City's] biweekly payroll plan." While this letter does not have the same force as an agency regulation, or even of a formal opinion letter from the Wage and Hour Administrator, it is nonetheless instructive.

Second, regulations governing the calculation of the "work period" for overtime purposes provide that an employer may change the beginning and ending of the "work period" so long as "the change is intended to be permanent and is not designed to evade the overtime compensation requirements of the Act." 29 C.F.R. § 553.224; *see also id.* § 778.105 (same). Admittedly, these regulations refer only to overtime pay, and speak to changes in the "work period." They thus do not directly govern changes in the pay date like those before us. Nevertheless, we believe that, by analogy, they are relevant in determining the proper construction of the statute as it applies to this case.

permanent change in the pay schedule that satisfies the three-part test outlined in this opinion, the lateness of the payment may obviously be measured not only in relation to how much time had elapsed between when the wages were earned and when they were paid out, but also in relation to the date on which the workers had a contractual right to receive their wages.

The regulations recognize that an employer (in the context of overtime) may, for a legitimate business purpose, wish to change its accounting system. They conclude that when such a change is permanent and is not designed to evade the minimum wage, overtime, or prompt payment requirements of the FLSA, the values that the Act is designed to protect—guaranteeing workers a minimum wage and reasonable hours—are not offended.[5] They do so in the particular setting of overtime wages. But their underlying reasoning applies just as well to payments of ordinary wages.

## C. Application of the Test

To summarize: Whether the prompt payment requirement of the FLSA has been violated must be determined by reference to objective standards. In general, the prompt payment requirement is not violated when an employer changes the pay schedule, provided that the change: (a) is made for a legitimate business reason; (b) does not result in an unreasonable delay in payment; (c) is intended to be permanent; and (d) does not have the effect of evading the FLSA's substantive minimum wage or overtime requirements.

This case comes before us on appeal from the district court's *sua sponte* dismissal of the plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, which we review *de novo*. *See, e.g., Sykes v. James,* 13 F.3d 515, 518–19 (2d Cir.1993). Like the district court, we are required to accept the material allegations in the complaint as true. Dismissal is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ In the case before us, it is clear that, even if the facts are as the plaintiffs allege, the change did not have the effect of evading the substantive minimum wage or overtime provisions of the FLSA. But the plaintiffs also assert (1) that the change was not intended to be permanent; (2) that it resulted in an unreasonable delay in payment; and (3)

that it was motivated by something other than a legitimate business purpose, namely by the desire to transfer money from the officers' pockets to the city's coffers and to retaliate against the police union for its refusal to make certain concessions in contract negotiations. If the plaintiffs were able to prove these allegations, the city's actions would not satisfy the test outlined above. Accordingly, the case should not have been resolved on a motion to dismiss.

### 1. Minimum Wage & Overtime Provisions

■ To understand fully why the substantive wage and hour provisions of the FLSA were not directly violated by the change, it is helpful to examine exactly how the new pay schedule was implemented. The plaintiffs' pay was delayed by one day each week for five weeks. Once the week-long lag had been phased in, the switch to the biweekly pay system was made. In other words, the plaintiffs were paid:

On Friday, October 7, for the week ending Saturday, October 8;

On Monday, October 17, for the week ending Saturday, October 15;

On Tuesday, October 25, for the week ending Saturday, October 22;

On Wednesday, November 2, for the week ending Saturday, October 29;

On Thursday, November 10, for the week ending Saturday, November 5;

On Friday, November 18, for the week ending Saturday, November 12;

On Friday, December 2, for the *two* weeks ending Saturday, November 26;

On Friday, December 16, for the *two* weeks ending Saturday, December 10;

On Friday, December 30, for the *two* weeks ending Saturday, December 24;

And so forth on a biweekly basis.

The plaintiffs' claim is that they are entitled to a week's worth of pay in liquidated damages for each of the five weeks during which they were paid one additional day late while the new pay schedule was being phased

---

**5.** The requirement that a change be permanent prevents employers from "changing" their pay schedules to delay the payment of wages whenever they are so inclined.

in. They also seem to allege that, as a result of the change, they were denied a week's pay. Indeed, they contend that "the entire design of the defendants' delayed payment scheme was to evade the obligation to pay plaintiffs for a week's work." The plaintiffs do not, however, claim in this lawsuit that they are entitled to reimbursement and liquidated damages for the week's worth of "lost wages."

This omission seems odd at first, until one realizes that, as the plaintiffs are surely aware, it is simply not correct to say that a week's wages were skipped. Under their contract, the police officers were entitled to be paid a certain amount for the period between January 1, 1994, and December 31, 1994. Thus, junior officers had the right to receive $25,262.00 during this one-year period. As a result of the lag, the officers received only 51/52 of the figures listed in their contract for 1994 by December 31, 1994. Thus, junior officers would have received only $24,776 each by December 31, 1994, and would not receive the remaining $486 until January 13, 1995. As the arbitrator held, therefore, the officers were denied *timely* payment of a week's wages that were due to them under their contract.

But there has been no serious suggestion—let alone any proof—that a week's payment was permanently skipped. It was only delayed. If, for example, an officer quit work on December 31, 1994, she would be paid for the work done between the end of the last pay period (December 24) and the date of departure (December 31). She would, of course, receive the check up to two weeks later than she would have under the prior schedule (on January 13 rather than on December 30). But she would get her money. Moreover, since the plaintiffs' wages for every work week were greater than the statutory minimum *even when the wages were discounted for the delay in payment,* each employee would be paid at least the minimum wage for every hour he or she worked. It follows that the new pay schedule did not result in an evasion of the substantive minimum wage or overtime requirements of the FLSA.[6]

### 2. Other Factors

A pay scheme that does not result in the direct evasion of the substantive minimum wage and overtime provisions of the FLSA may nevertheless violate the statute's implicit prompt payment requirement. The plaintiffs have alleged facts that, if proven true, would establish such a violation in the case before us. The plaintiffs contend that the administrative reasons proffered by the defendants to explain the change were pretextual, and that the real reasons for the change were to collect a week's worth of interest on the withheld wages and to retaliate against the officer's union for refusing to make certain concessions in contract negotiations. In addition, the plaintiffs contend that the change was not intended to be permanent, and that the delay in payment was unreasonably long.[7] On a motion to dismiss pursuant to Rule 12(b)(6), we must accept as true the plaintiffs' allegations. Since it would not be impossible for the plaintiffs to prove these allegations, and if they were proven true, the

---

**6.** Similarly, the plaintiffs only claim damages for the first five weeks during which the new schedule was implemented. They do not claim that they are entitled to liquidated damages for every week that they were paid under the new pay schedule—every week from December 1994 until the arbitrator ordered the city to switch back to the old pay schedule in June 1995. But during these six months, the plaintiffs were not paid, *on time,* the wages that were contractually due to them. Were we to accept the plaintiffs' interpretation of the FLSA, it would seem that they would be entitled to liquidated damages for each of these weeks. This is so because in the plaintiffs' view, the FLSA is violated *whenever* wages are not paid on the contractual pay date. And the right to liquidated damages cannot be waived by the employee. *See Brooklyn Sav. Bank,* 324

U.S. at 707, 65 S.Ct. 895. Once again, the plaintiffs' own failure to argue that they are entitled to double wages for the whole six month period during which they were paid their full wages one week or two weeks late, suggests that they themselves are not convinced by the logic of the position they maintain. In fact, to grant double payments for that whole time *would* be absurd.

**7.** We note that a week's delay in the circumstances of this case would, as a matter of law, not be unreasonably long, at least in the absence of evidence either that the change was not designed to be permanent or that it was made for improper motives.

defendant's actions would violate the FLSA, the complaint should not have been dismissed.

\* \* \* \* \* \*

We hold that the FLSA does not prohibit an employer from changing the payday of its employees for a valid business purpose, provided that: (a) the change is made for a legitimate business purpose; (b) there is no unreasonable delay in the payment of wages; (c) the change is intended to be permanent; and (d) the change does not result in the violation of the substantive wage and hour requirements of the Act. In the case before us, the undisputed evidence shows that the change in the City of Troy's pay schedule satisfied part (d) of this test. The plaintiffs have alleged, however, that the remaining factors of the test are not satisfied. While it may be that the plaintiffs can produce no evidence in support of their allegations, we must accept them as true at the 12(b)(6) stage. Accordingly, we reverse the judgment of the district court dismissing the plaintiffs' complaint for failure to state a claim and remand the case for further proceedings consistent with this opinion.

KOELTL, District Judge (Concurring in Part and Dissenting in Part):

The Court adopts an interpretation of the Fair Labor Standards Act (the "FLSA" or the "Act") that justifies an employer's late payment of wages to its employees if that late payment was due to the employer's effort to change its pay schedule. That interpretation creates an exception to the FLSA's prompt payment requirement that includes criteria such as that the change is made for a "legitimate" purpose, does not result in an "unreasonable" delay in payment, is "intended" to be permanent, and does not have the "effect" of evading the FLSA's minimum wage or overtime requirements.

I agree with the Court "that the FLSA does not prohibit an employer from changing the payday of its employees." However, I do not agree that the Act allows an employer to implement such a change in a manner that violates the FLSA's prompt payment requirement. I do not find the Court's new exception to the prompt payment require-

ment justified by the prior cases, or by the regulations or administrative opinions that have interpreted the FLSA. Thus, I concur in the judgment reversing the dismissal of this action. I respectfully dissent because I believe the plaintiffs' motion for partial summary judgment should be granted with respect to liability for the violation of the Act's prompt payment requirement. I would remand the case for a determination of damages.

Although the FLSA is silent as to the day and period that an employer must pay its employees, the Court today agrees that the Act requires "prompt payment." This prompt payment requirement should be measured, however, against the regular payday and not against the sliding scale of reasonableness which the Court appears to apply. As the Court of Appeals for the Ninth Circuit explained in *Biggs v. Wilson,* 1 F.3d 1537 (9th Cir.1993), *cert. denied,* 510 U.S. 1081, 114 S.Ct. 902, 127 L.Ed.2d 94 (1994), the Act "necessarily assume[s] that wages are due at some point, and thereafter become unpaid." *Id.* at 1539–40 (noting that "[t]he only logical point that wages become 'unpaid' is when they are not paid at the time work has been done, the minimum wage is due, and wages are ordinarily paid—on payday."). In recognizing that there is no principled way to distinguish under the statute between late payment of wages and non-payment of wages, the Court of Appeals for the Ninth Circuit expressly rejected the adoption of a balancing test that would "require[ ] payment which is reasonably prompt under the totality of the circumstances in the individual case." *Id.* at 1540. The Court of Appeals explained:

Any kind of sliding scale we can think of, however, would be contrary to the statute's direction that employers shall 'pay' the minimum wage and that employees are entitled to recover 'unpaid' minimum wages. It also would force employees, employers, and courts alike to guess when 'late payment' becomes 'nonpayment' in order to determine whether the statute of limitations has begun to run, the amount of unpaid wages and liquidated damages to

be awarded, and how much prejudgment interest has been accrued. *Id.* at 1540.

The holding in *Biggs* appropriately considered the FLSA's prompt payment requirement in light of the statutory scheme as a whole, and that statutory scheme necessarily assumes that wages are due at a definite point in time and thereafter become unpaid. *Id.* at 1539. *Biggs* is fully consistent with the Supreme Court's decision in *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), which referred to the employer's obligation to pay the statutory minimum wage "on time," the necessity for "prompt payment," the availability of an action arising from "delay in payment," and the employer's obligation for "overdue wages." *Id.* at 707, 707 n. 20, 709, 711, 65 S.Ct. 895. *Biggs* is also consistent with those decisions cited by the majority that interpret the Act's prompt payment requirement. *See, e.g., Calderon v. Witvoet,* 999 F.2d 1101, 1107 (7th Cir.1993) (the FLSA requires an employer to pay "on time"); *United States v. Klinghoffer Bros. Realty Corp.,* 285 F.2d 487, 491 (2d Cir.1960) (an employer is not relieved of liability for FLSA violations by making late payment after the original payment becomes due); *see also Atlantic Co. v. Broughton,* 146 F.2d 480, 482 (5th Cir.1944) (failure to pay the full amount of minimum wages and overtime on "any regular payment date" immediately creates the obligation to pay the difference between the wages paid and the wages due, plus an equal "amount as liquidated damages....").[1] Indeed, the District Court properly recognized in this case that "the failure of an employer to pay at least a minimum wage to an employee *on the regular payday* gives rise to a claim pursuant to the FLSA." *Rogers v. City of Troy,* 949 F.Supp. 118, 123 (N.D.N.Y.1996) (emphasis added). Further, the City conceded that the "FLSA implicitly commands employers to pay wages promptly when due." (Appellees' Br. at 11, citing *Brooklyn Savings Bank; Biggs, Klinghoffer,* and *Calderon* ).

The requirement of payment on a regular payday is also supported by the most authoritative regulatory interpretations of the statute. As the Wage–Hour Administrator

concluded, "[T]he minimum wage due for a particular workweek must be paid on the regular payday for the period in which such workweek ends." Opinion Letter No. 63 (Nov. 20, 1961), reported in CCH Labor Law Reports ¶ 30,581; *see* Opinion Letter No. 942 (Jan. 27, 1969) ("Compensation to employees under the Act for a particular workweek must be paid to the employee on the regular payday for the period in which such workweek ends, ...."), reported in CCH Labor Law Reports ¶ 30,954. Hence, the statutory scheme, prior cases, and administrative interpretations require not simply that wages be paid within a reasonable period of time after they are earned, but rather that they be paid on the regular payday.

The Court today adopts an explicit and very detailed exception to the Act's prompt payment requirement that allows an employer's late payment of wages if the late payment is made, pursuant to a change in the pay schedule that is intended to be permanent, for a legitimate business reason, and which does not result in an unreasonable delay in payment, and does not have the effect of violating the "substantive" minimum wage or overtime requirement of the FLSA. However, that exception is not found in the statute or regulations or prior interpretations of the statute and it is inconsistent with the Act's requirement of prompt payment on a regular payday. The two specific bases that the Court relies on in creating the new exception are an analogy to the Act's overtime regulations and an informal letter written in the course of this litigation by a district director of the Department of Labor's Wage and Hour Division. Neither of these bases provides sufficient support for the creation of such an exception to the Act's prompt payment requirement.

The overtime regulations on which the Court draws its analogy, 29 C.F.R. §§ 553.224 and 778.105, are inapposite because they do not relate to the determination of the regular payday for the payment of minimum wages. Those regulations apply to the Act's overtime provisions and do not by their terms apply outside the context of overtime. Moreover, those regulations expressly

---

1. The payment of liquidated damages is no long-   er compulsory. *See* 29 U.S.C. § 260.

refer to changes in the *work* period, not the *pay* period.[2] *See generally* 29 C.F.R. §§ 778.100–778.104 (emphasis added). Indeed, § 778.106 expressly requires that the *payment* of overtime be made on the employees' regular payday regardless of a change in the work period on which the overtime calculation is based. Further, that section does not include a provision which allows a change in the regular payday once the conditions for changing the work period have been met. Thus, there is no regulation that permits an employer to pay its employees later than the regular payday simply because it was in the process of changing that payday. The Department of Labor could have drafted such a regulation, as it did in connection with determining the work period for overtime, but it has failed to do so.

The majority views an informal letter by a Department of Labor Wage and Hour Division district director as instructive in presenting the Department's views with respect to the exception to the Act's prompt payment requirement. (Joint App. at 162.) However, as the Court recognizes, that letter does not have the same force as an agency regulation or a formal opinion letter from the Wage–Hour Administrator. Indeed, there is no regulation or formal opinion letter which permits an employer's late payment of wages if that late payment is part of an effort to change the employees' regular payday. Rather, the most authoritative regulatory interpretations of the FLSA stress the requirement of paying compensation on the "regular payday." Moreover, the district director's opinion is entitled to somewhat less weight because it did not address the requirement of payment on a regular payday or the issue of late payment.

In sum, the FLSA requires prompt payment of the minimum wage. Timeliness of payment under the Act is determined with respect to the regular payday on which an employer pays its employees. The parties do not dispute the arbitrator's finding that the City's weekly payment to the officers of un-

lagged paychecks every Friday over an 18–year period constituted a past practice that rose to the status of a contractual right. Thus, the arbitrator effectively found that in this case, Friday was the officers' regular payday under the collective bargaining agreement.

Allowing the parties to contract for a regular payday in their collective bargaining agreement is consistent with the Supreme Court's decision in *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). It is plain that employees should not be permitted to waive an employer's liabilities under the Act. However, this rule should be interpreted consistently with the language and purpose of the FLSA, which as the Court explains, is to protect workers by ensuring that they are paid a fair day's pay for a fair day's work. As the Court of Appeals for the Third Circuit explained in *Vadino v. A. Valey Engineers,* 903 F.2d 253 (3d Cir.1990), neither the language nor the purpose of the FLSA is violated when parties contract for specific items that are not specifically covered by the FLSA—such as the regular payday in this case—provided that their contract does not undercut the protections of the Act. *Id.,* 903 F.2d at 266 (noting that under these circumstances, the resolution of an employee's FLSA claim "would be dependent upon the resolution in the ... contract interpretation issue"). Since applying the contractually agreed-upon regular payday in this case would not lessen the plaintiffs' protection under the FLSA, the Act's language and purpose would not be violated by requiring payment on that regular payday, and there is no basis to create an exception to the statute.

The City could have changed the regular payday in this case without paying its employees later than the regular payday and violating the FLSA's prompt payment requirement. It could, for example, have paid in advance of the change so that there was no late payment. Instead, the City chose to pay

---

**2.** The overtime regulations prevent an employer from expanding its employees' work period in order to allocate the total hours worked over a longer period for purposes of reducing the amount of overtime pay earned. *See* §§ 778.104

& 778.105. The overtime regulations remedy a policy concern that is unrelated to the prompt payment requirement for minimum wages imposed by 29 U.S.C. § 206(b).

later than the regular payday established under the collective bargaining agreement while it implemented the change to a new regular payday. The effect of that decision was to pay the officers only 51 weeks of pay for the 52 weeks of work they performed in 1994 in violation of the Act's prompt payment requirement.

Because I would reverse the dismissal of the complaint and remand solely on the issue of damages, I concur in the judgment and respectfully dissent with respect to the Court's adoption of a new exception to the FLSA's prompt payment requirement.